EMILIE RUFF, WINNIFRED HENCHER, ELMER BAUER, RAYMOND BAUER, and VERNON BAUER, Appellants, v. LOUIS A. YOUNG, JR., and E. M. WILLIAMS, Public Administrator of Jefferson County, Missouri, having in charge the ESTATE OF LOUIS YOUNG, SR., Deceased.—No. 39416.—190 S. W. (2d) 208.

Division One, October 1, 1945.

Rehearing Denied, November 5, 1945.

*Sam M. McKay* and *R. E. Kleinschmidt* for appellants.

508

*W. A. Brookshire* and *M. C. Matthes* for respondents.

BRADLEY, C.—Action to set aside a deed to 160 acres of land in Jefferson County. Finding and judgment for defendants and plaintiffs appealed.

Louis Young, Sr., and his wife, Winnifred, were the grantors, and Louis Young, Jr. was the grantee. Plaintiffs. Ruff and Hencher are daughters of the grantors; other plaintiffs are grandsons. Defendant Young is a son of the grantors and known as Louis Young, Jr. Defendant Williams is public administrator in charge of the estate of Louis Young, Sr. The term defendant hereinafter used, when meaning a defendant in the present case, has reference to defendant Young,

and sometimes Louis Young, Sr. is referred to as the grantor, the father, and Young, Sr.

The grounds alleged for setting aside the deed are: (1) That it was probably not actually executed; (2) that it was not delivered; (3) that it was not supported by sufficient consideration; (4) that it was testamentary in character; and (5) that it was obtained by fraud, coercion and undue influence practiced upon grantor Louis Young, Sr. by defendant. The effect of the answer is a denial of all these alleged grounds.

Grantor Louis Young, Sr. purchased the land in 1910, and the deed was to him. All the family, the husband, wife, and children thereafter lived on the place until the girls married and moved away. Plaintiff Ruff was 19 years old when the farm was purchased in 1910; she married in 1912. Plaintiff Hencher was 10 years old in 1910; she married in 1921. Annetta Bauer, a deceased daughter of the grantors, and the mother of plaintiffs Bauer, married in 1904, prior to the purchase of the land. Defendant was 22 years old in 1910. He married in 1916, but continued to live on the place and in the house with his father and mother. He was away for about a year in the mail service in 1922 or 1923, but his wife and children remained with his father and mother on the farm. Through the years the daughters visited their parents often and no estrangement ever existed, and the usual affection for the grandsons also existed.

The deed was dated September 21, 1935, but was signed and acknowledged September ▆▆▆ 28, 1935. It was filed for record September 22, 1936. Grantor Louis Young, Sr. died September 18, 1936, at the age of 82. His wife died December 1, 1940, at the age of 78. This suit was filed September 8, 1942. Louis Young, Sr., at the time of his death, owned 40 acres of land near the home place, but not involved here.

The deed was prepared by Charles W. Green, an attorney of DeSoto, Missouri, and as a notary, he took the acknowledgment. As stated, the deed was dated September 21, 1935, but signed and acknowledged on September 28, and this is a circumstance given some attention. Green testified that defendant, about a month prior to the execution of the deed, had asked him to go out in the country to the Young home "and make a deed", and that he (Green) said he would, and defendant said, "I will be after you." Defendant came on September 21. Green could not go that day, but he commenced to fill out a blank deed and put in the date; "did not have the description of the land and could not prepare it any further."

Green further said that on September 28, defendant came in for him; that he took his typewriter and pen and went with defendant, in defendant's car, out to the Young home; that grantor Young, Sr. said to him when he arrived, "I am glad you came out; I want to deed this farm over to Louie" (defendant), and I said, 'Well, I will have

to have the description.' " That Young, Sr., then gave him two deeds from which to get the description; that he prepared the deed; read the description to see he had it right; that it was signed by the grantors in his presence and that he, as notary, took the acknowledgment; that Young, Sr. paid him "right there in the house"; that when the deed was finished he handed it to Young, Sr.; that he (Young, Sr.) in turn "handed it to defendant." The grantors' names, purporting to be their signatures, appeared on the deed as "Loui Young, Sr., Winifred Young." Plaintiff's evidence was that Young, Sr. signed his given name *Louis* and not *Loui,* as it appeared on the deed, and that Mrs. Young was well educated and spelled her name Winnifred, two *ns* and not one, as on the deed. Green said he asked Mrs. Young how she spelled her given name and that she told him *Winfred,* but in the deed he spelled it "Winifred."

Part of the acknowledgment was written with a pen, although Mr. Green had his typewriter. In explanation, Green said that the table on which he had the typewriter was rickety and that he set the typewriter on the floor when the grantors signed, and that he finished with a pen. Plaintiffs took defendant's deposition and his wife was also a witness. Both testified that the deed was delivered by Young, Sr. to defendant.

At the trial the deed was presented to Mrs. Ruff and she was asked if she recognized "those signatures as the signatures of her father and mother", and she answered, "No." She said she was not as familiar with her father's signature as with her mother's. The spelling of the given names, it seems, is what confused Mrs. Ruff more than the writing. On cross examination she said her mother's name on the deed "looks like her writing", but that she was not going to say "it was her signature; if the letters were all there I could say so."

As to the signatures on the deed Mrs. Hencher testified: "Q. How do these signatures compare with other signatures? A. They do not look the same, but I would not like to say definitely. Q. What difference is there? A. That is all I could tell you. I would not like to say it was or wasn't. There seems to be a difference." Elmer Bauer, one of the plaintiff grandsons, testified that his grandmother's name on the deed did not "look like her writing."

The trial court filed a memorandum opinion, which is in the record. Such is not a part of the record, but may be considered as advisory and show the trial court's theory. Smith v. Pettis County, 345 Mo. 839, 136 S. W. (2d) 282, l. c. 285. In the memorandum the trial court said: "The plaintiff's testimony on the issue of the genuine character of both signatures, however, is not convincing. The court personally examined the signatures with other admitted handwriting of these people. Considering all of the evidence, the court is convinced that Winnifred Young and Louis Young, Sr., signed the deed in question, and that the signatures appearing on the deed are genuine."

512

We rule the points made on execution and delivery against appellants. See Aude et al. v. Aude et al. (Mo. Sup.), 28 S. W. (2d) 665; Zumwalt et al. v. Forbis et al., 349 Mo. 752, 163 S. W. (2d) 574; Klatt et al. v. Wolff et ux. (Mo. Sup.), 173 S. W. (2d) 933; Edinger et al. v. Kratzer (Mo. Sup.), 175 S. W. (2d) 807, l. c. 813.

Should the deed fail for lack of consideration? The deed recites a consideration of "one dollar and services performed by party of the second part, a period of 12 years." As stated, defendant was 22 years old when the land was purchased. The father did not pay in full for the land when he purchased in 1910. Defendant said he assisted in paying this balance by working on the farm. He testified:

"We cut cord wood and sold it and father had some ties cut, and that paid off the notes; I assisted in cutting the cord wood, which was chopped off the farm; when I married in 1916 I lived with my folks on the farm, and was engaged in general farming and dairying, began dairying in the fall of 1914, to the best of my knowledge; when I married two years later, I had accumulated a few cows, bought a few and had some that my father and mother had given to me to start with; I could not say what cows he had when I married; I had a team of mules and a gray horse that he gave me, and had farming machinery, at that time the biggest part was his. I had bought some plows and harrows and things like that; when I married in 1916 our understanding was, I was to stay there and help pay the debts on the place and when we got the debts paid we were supposed to divide the profits fifty-fifty as long as he was able to work; when he was not able to work, he said that all he wanted was a place to sleep and eat; we had that arrangement when I married, and I remained on the farm working on that basis until the fall of 1920, I think."

In Wells et al. v. Kuhn et al. (Mo. Sup.), 221 S. W. 19, the sufficiency of the consideration for a deed was involved. There it was said: "The consideration recited in the last deed, in addition to that expressed in the first one, is $1 and Kuhn's promise to procure and erect a suitable tombstone at Goslin's grave. With this recital in the deed, it is immaterial whether the consideration was inadequate merely, or entirely lacking in fact. Such inadequacy or want of consideration, in the absence of fraud or mistake, would not defeat the operative words of the deed as a grant."

We rule, infra, that the evidence does not justify overturning the trial chancellor's ruling that the deed should not be set aside on the ground of fraud, coercion and undue influence, hence we rule the assignment on inadequate consideration against appellants. See Wells et al. v. Kuhn et al., supra; Chambers v. Chambers, 227 Mo. 262, 127 S. W. 86; Blackiston et al. v. Russell et al., 328 Mo. 1164, 44 S. W. (2d) 22, l. c. 27; Clark v. Skinner et al., 334 Mo. 1190, 70 S. W. (2d) 1094, l. c. 1097.

Was the deed testamentary in character? Immediately following the covenant of warranty in the deed was this: "Said parties of the first part hereby reserve a life estate in aforesaid premises, and title is to vest in party of the second part at their natural death." In Wimpey et al. v. Ledford et al. (Mo. Sup.), 177 S. W. 302, the alleged testamentary clause in the deed was: "This deed is made with the understanding that the aforesaid Samuel Ledford and Nancy Ledford (grantors) shall have all controlling power of the above-described premises during their lifetime, and at their death then the title is to pass to parties of the second part." After a review of the authorities, the court, in the Wimpey case, said: "Under these authorities, and impelled by reason, when all of the instrument is construed together, we are constrained to hold that the word 'title', as employed in the limitation, means the right to possession." See also, McAlister v. Pritchard, 287 Mo. 494, 230 S. W. 66; Dawson et al. v. Taylor et al. (Mo. Sup.), 214 S. W. 852. We rule that the deed, in the present case, was not testamentary in character, and able counsel for plaintiffs, in effect, so concede.

Was the deed obtained by fraud, coercion or undue influence? Plaintiffs' evidence on these issues was about as follows: Between 1916 and 1920, on several occasions, defendant asked his father to deed him the farm. The father, in 1932 or 1933, stated to his daughter, Mrs. Ruff, that defendant was trying to get him to deed him the farm, but said he was not going to do that, because "he will kick me out when I get old." Defendant said to his father on some occasions that he, defendant, "did not want the Bauer boys in on it." Defendant told his father, if he deeded the land to him "that if I died before he did, I would give it back to him." At the trial he said that he made such promise before he was married.

Mrs. Young, one of the grantors, said, in 1934, that "Louie (defendant) wants father to sell the 40 acres (not in the deed), improve our home place; then he shall get everything, and he is not going to have his way." Just a few hours before her death, the mother, Mrs. Young, said to defendant: "Louie, don't do with my funeral like you wanted to do with father's funeral; I want you to see that the rest get something." The mother, apparently having reference to the deed, said on one occasion to her daughter, Mrs. Hencher: "I am as innocent of all this as your two little children." In September, 1935, plaintiff, Mrs. Ruff, was at her father's house and on that occasion defendant came in the back door, pushed the father out the back door and said, "Come on; if you don't sign the papers Umbdenstock (constable) said we never would get that s. b. off the farm." Mrs. Ruff said that later defendant told her that was the day the deed was signed.

Neither of the plaintiffs knew anything about the execution of the deed until the day of the father's funeral. At that time defendant told his sisters that his father had deeded him the farm, except

the 40 acres, and that if the other heirs would chip in and help pay the funeral expenses, the 40 acres would not have to be sold. Defendant was appointed administrator of his father's estate in September, 1936; resigned in May, 1942; the public administrator was appointed. The 40 acres were sold to defendant for $500 and in a short time he sold it at a profit of some $300. Defendant refused to permit the plaintiffs or their counsel to examine the deed until the day of trial and not then until the court was appealed to.

Plaintiffs made no claim that the grantor did not have the necessary mental capacity to execute the deed. They did, however, claim that at the time of the execution of the deed he was slowing down mentally and physically and that such made him more susceptible of being overreached and influenced. On this subject plaintiffs, in the brief, say:

"None of the plaintiffs testified that either the grantor or his wife was mentally incapacitated, it having been distinctly stated by their counsel throughout the trial that there was no charge or claim of mental incapacity, but merely of both mental and physical weakness on the part of grantor as an element in connection with the charge of undue influence. The testimony on the part of the plaintiffs further showed that while their mother was rather well educated and retained her mental faculties up to the very last, the father never did write very much, in fact, nothing more than to sign his name, and that he became childish and more or less morose and non talkative during the last year or two of his life." The trial chancellor, in the memorandum opinion, said this:

"Physically, the old gentleman was gradually becoming weaker and more infirm the last two or three years of his life, but there is no basis to conclude that his mind was weaker or more susceptible to influence during these last years than it had ever been. The great weight of the evidence on this point leads the court to find that Louis Young, Sr., on and before September 28, 1935, not only was mentally competent, but was fully capable of making up his own mind about the disposition of his property and was not so constituted mentally as to be susceptible to influence opposed to his own will."

As stated, there was no estrangement between grantor and his daughters and grandsons. The daughters were frequently at his home after the deed was executed and before his death. The deed, however, was not mentioned. This might imply that the father had suggested such silence and that he was not especifically proud that he had favored his son over his daughters and grandsons. And it might be inferred from the record that the mother was not entirely happy about it, and would have preferred something different, but was resigned to let it go as the father seemed to want it. There was no evidence that the father could be easily influenced. Rather, the evi-

dence was that he was a man of "a good strong mind", and "a very set mind."

"The law does not ban the influence which springs from the natural affection of a parent for his child, nor does it preclude the parent, if in the exercise of his free will, from bestowing his bounty on one child more generously than on his other children." Burgdorf et al. v. Keeven et al., 351 Mo. 1003, 174 S. W. (2d) 816, 1. c. 820. Influence, to be undue, must arise to the mark of such overpersuasion, coercion, force or deception as breaks the will power of the person overinfluenced and puts in its stead the will of another. Hedrick et al. v. Hedrick et al., 350 Mo. 716, 168 S. W. (2d) 69, 1. c. 74, and cases there cited.

"Undue influence cannot be made out by mere suspicion or the mere showing of an opportunity to influence. 'There must be somewhere proof of an undue influence itself. . . . To be effective, it ought to be sufficient to destroy the free agency of the deceased at the time of making the' deed. 'It must not be merely the influence of natural affection; for affection is a stream that presumably flows at all times and its waters are under no ban known to the law. There must be present and in active exercise overpersuasion, coercion or force, fraud or deception breaking the will power of the' grantor." Lastofka et al. v. Lastofka, 339 Mo. 770, 99 S. W. (2d) 46, 1. c. 57.

There is nothing in the record that would justify overturning the finding and decree of the learned chancellor below. The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.