**Hilda LAPE and Fred Oberman, Respondents,**

v.

**George OBERMAN, Jr., Appellant.**

No. 44456.

Supreme Court of Missouri.
Division No. 2.

Nov. 14, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied Dec. 12, 1955.

R. P. Smith, Cape Girardeau, for appellant.

Raymond H. Vogel, Cape Girardeau, for respondents.

BARRETT, Commissioner.

This is a suit by a sister and her brother, Hilda Lape and Fred Oberman, to set aside and cancel a warranty deed from their father, George Oberman, Sr., to their brother, George Oberman, Jr. The deed to thirty-three acres of land of the value of $3,300 to $4,125, in Cape Girardeau County, was executed on the 20th day of November 1950 and recorded on April 21, 1952, after the father's death on April 18th. It was alleged in the petition to set aside the deed that the grantor was of unsound mind, but the trial court found for the plaintiffs and canceled the deed for

the specific reasons that "the deed was never delivered during the lifetime of the grantor with intent to pass present title" and "was obtained by the said George Oberman, Jr., by means of undue influence." These are the questions briefed and argued by the parties and upon this review of the record anew the problem is whether, in view of the appropriate equitable principles, Binnion v. Clark, 359 Mo. 202, 206, 221 S.W.2d 214, 216, and the particular facts and circumstances, Ulrich v. Zimmerman, 349 Mo. 772, 785, 163 S.W.2d 567, 574, the trial court has properly canceled the deed upon the grounds stated in the decree. Meyer v. Schaub, Mo., 266 S.W.2d 620, 622.

Mr. George Oberman, Sr., was eighty years of age when he died in April 1952. For the most part, he lived alone on the thirty-three acres; he had but few friends and the inference is that he was a lonely old man. In 1910 the County Court of Cape Girardeau County committed Mr. Oberman to the state hospital at Farmington where he remained for nine years. His illness was diagnosed as paranoia. Upon his release from the institution he returned to "the home place" and thereafter manifested no symptoms of insanity. His daughter, Hilda, said that during the last two years of his life his physical condition was "pretty poorly," he had no disease, "it was old age," and he was confined to his bed the "biggest part of the time." The son, Fred, said that his father's physical condition in 1950 "wasn't too good. He wasn't able to work no more" and it had been eight or nine years since "he quit farming for himself." Fred rented the farm for four years and during the last four or five years George rented the farm, "Dad said a third, that is what he told me." The plaintiffs' principal witness, Mabel Kindred, said that during the last four years Mr. Oberman's health was bad. According to her the cause of his bad health was that "He stayed drunk all the time. * * Night and day, all the time, I never seen him that he wasn't drunk." She had purchased as much as fourteen pints of liquor a month for him, and she said that both George, Sr., and George, Jr., were drinking the morning the three of them went to town to execute the deed, and after the deed was executed George, Jr., got "a fifth" at Joe Culotta's and they continued drinking on the way home. Mr. Oberman's attending family physician, who had seen and treated him for some time and was at his home the evening before he died said, however, that he "had a heart condition" and "hardening of the arteries." Although he had treated him in his office and in his home he knew nothing of Mr. Oberman's drinking, "he was old and I gave him perhaps kidney medicine when he needed it, maybe blood pressure tablets along as he needed them, maybe a hypo now and then for him to rest, things like that. I looked after his general health, he was so old, because I knew he was incurable."

Before considering whether the deed was delivered and whether it was procured by undue influence, it is necessary to a complete understanding of this record to set forth Mabel Kindred's relationship to the parties and the property involved in this action. Mabel, aged fifty-three years, lived southwest of the thirty-three acres a mile and a half or two miles. Over a period of fourteen years she visited Mr. Oberman frequently, sometimes twice a day, she said. George, Jr., was never married and for twelve years "boarded" with Mabel. His brother Fred said, "I don't know whether you would call it living or not, he stayed with Mabel Kindred." Mabel said, "I boarded him twelve years, what time I didn't run him off. * * * I run him off fifty times, I guess." She would go to town with him and "sit in the car while he went and got drunk" and "every time he throwed a drunken fit" she would run him off. But George persisted in returning, "Well, he kicked the lock off of my door, he would want to come back and I wouldn't let him in, he kicked the lock off of my door and I run him off. I wouldn't let him in." The climax in their relationship came on Easter Sunday 1953, after Mr. Oberman's death, on that day she ran George off and he had not returned.

But, when they were on more agreeable terms, George "never said nothing" to Mabel about getting a deed from his father. "The only time he talked about it was when he was drunk." One time, three or four months before the execution of the deed, he did say something about it; "Yes, he come up drunk one night, said he was going to make the old man let him have that place, he said he and the old man had hell, that he was going to go back and they was going to have some more hell if he didn't let him have that place." The only other time George talked about the place was upon the occasion of Mabel's informing him that "the old man" wanted to sell the land to her. In describing this conversation and a conversation with the father she said, "Well, I went over there one morning and the old man was setting up in bed crying. * * * He said he had to let George have the place or he was going to put him in a home at Poplar Bluff and he didn't want to go, it wasn't right. I told him, I says, 'Well come and stay with me.' He said, 'No, I don't want to, I want to stay here the rest of my life.' * * * He wanted to sell me the place but George wouldn't let him. * * * I told him I'd buy it and I asked George about it and George said, 'You are not going to get it, I am getting it myself or I am not going to take care of him.'"

■ The brother and sister, Fred and Hilda, lived near by but they had no knowledge of the deed until George, Jr., informed them of the fact after their father's death. All that is known concerning the deed, aside from its provisions and except the fact that George recorded it the third day after his father's death, is what Mabel had to say on the subject. As indicated, she went to Cape Girardeau with them the day the deed was executed. They had no previous arrangement concerning the trip. "He come out and he said, 'Hurry up, the old man decided to let me have the place and I might need you and I want to get up there, he might change his mind before he gets there.'" The three of them rode to town in George's truck and neither the father nor the son mentioned a deed on the trip into town. The three of them went to a lawyer's office, "I guess he thought of that himself, I don't know," and she waited in the lawyer's waiting room while the father and son were in the lawyer's private office. They left the law office and the three of them made the trip home and "nobody said a word" about a deed. In addition, she said, "I come to town with them but I didn't see the deed." The deed is dated November 20, 1950, and thenceforward neither George nor the father talked to Mabel about the deed except that the father "told me three days before he died that George had never paid him a penny and wasn't going to he didn't guess." From the father's statement to Mabel that he had to let George have "the place" and that George had not "paid him a penny and wasn't going to he didn't guess," it is plain that he had given some consideration to the subject and it could be inferred, perhaps, that he intended either to deed the property to George or to sell it to him on some basis. But in these circumstances, there were no words, or "verbal acts," plainly indicative of the grantor's intention to deliver the deed beyond recall, on the day he signed and acknowledged it, thereby conveying a present interest in the land, Klatt v. Wolff, Mo., 173 S.W.2d 933, 937–938, and the essential fact of his intention in this vital respect must be found elsewhere. It should be noted, however, since the delivery of a deed and thereby its effectiveness as a conveyance is a matter of intention on the part of the grantor, manual delivery is not essential to effectuate a legal delivery, if the grantor's conduct indicates an intention on his part to relinquish all dominion or control over the deed and to have it become presently effective as a conveyance of title. Annotation 129 A.L.R. 11–12.

In any event, the circumstances are distinguishable from the instances in which the grantor retains possession of an unrecorded deed and by his words and conduct plainly manifests his intention that the deed is not to be delivered to the grantee or become effective until after his death. Huey v. Huey, 65 Mo. 689; Forster v. Clark, 351 Mo. 59, 171 S.W.2d 647. It

plainly appears from the record that Mr. Oberman did execute the deed, there is no evidence that he retained possession of it, and George did record it. While the fact of Mr. Oberman's signing and acknowledging the deed does not in and of itself prove delivery, annotations 129 A.L.R. loc. cit. 48; 31 A.L.R.2d 532, 545, from the fact of George's recording the deed, it is a reasonably permissible inference that he had it in his possession, even though the circumstances in which it came into his possession are not apparent from this record. Zumwalt v. Forbis, 349 Mo. 752, 754, 163 S.W.2d 574. A compelling circumstance is the deed itself and its terms. It is a warranty deed and it purports to convey a present interest in the thirty-three acres to the grantee, George, Jr. Except for the fact that it expressly reserves a life estate to the grantor ("Subject, however, to a life estate in the First Party which is hereby expressly reserved") there is no manifestation from the deed of an intention that the effectiveness of the grantee's present interest is to be postponed. Annotation 31 A.L.R.2d 532. The fact is Mr. Oberman's reservation of a life estate is an indication that the instrument was not testamentary in character, McAlister v. Pritchard, 287 Mo. 494, 230 S.W. 66, and that he intended to effectively convey a present interest in the land. Noe v. Noe, 359 Mo. 867, 871, 224 S.W.2d 77, 79; annotations 129 A.L.R. loc. cit. 38; 31 A.L.R. 2d loc. cit. 570–578. In addition to reserving a life estate in the grantor, the deed contains this provision: "Second Party hereby covenants, as a part of the consideration for this deed, to pay to First Party on demand, the sum of Five Hundred ($500.00) Dollars, and to further pay within six (6) months after the death of First Party, to Woodrow W. Oberman, grandson of First Party, the sum of Five Hundred ($500.00) Dollars, and to pay to Paul Frederick Oberman and Walter Oberman, grandsons of First Party jointly, likewise within six months after the death of First Party, a like sum of Five Hundred ($500.00) Dollars." In October 1952 George, Jr., paid Fred's sons, Paul Frederick and Walter, $500 and the sons and their father

endorsed and cashed the check. Likewise he paid Mrs. Lape's son, Woodrow, $500. In his answer George plead that he had paid his father $500, but there was no evidence of the fact that he had or that his father, in the language of the "covenant," had demanded payment. George did pay $314.95 on his father's funeral bill, as well as certain other sums, and the inference that he would have drawn is that these payments were made by reason of or in lieu of the $500 provided in the deed.

Neither Fred nor Hilda had a conversation with George concerning the execution or delivery of the deed. Hilda did have a conversation with him concerning the fact that the deed was recorded "a year and a half after it was written." She said, "I just went up there and asked him to try to get together and have a settlement. * * * Well, he said that dad put it in his name—if George should get killed, dad would have to go through court to get it back in his name. George told me that's the reason dad fixed it that way. * * * Yes, that's the reason he didn't record the deed." As argued, conflicting inferences are reasonably permissible from this statement but even the unfavorable inferences do not, necessarily repel the inference of delivery. In addition, the respondents say, "It is inferable that the deed was placed in the lock box to which decedent has access." But the evidence respecting lock boxes, which came from a respondents' witness, was that Mr. Oberman had a lock box in the Farmers and Merchants Bank "for years" and in 1947 appointed George a deputy. In 1948 or 1950 Mr. Oberman surrendered his lock box and George rented a lock box and by written agreement appointed his father "as deputy." But there is no testimony from anyone that the deed in question was ever in either lock box, but even if it had been and both the grantor and grantee had had access to the box, that fact would not render ineffectual a delivery of the deed. Galloway v. Galloway, Mo., 169 S.W.2d 883, 888. In short, in all the circumstances of this record, the inferences supported by the testimony are that the deed plainly

manifests an intention to convey a present interest, that George had possession of it and recorded it; and there is no evidence compelling the inference that the deed was not delivered, or that it was Mr. Oberman's intention that it was not to become presently effective as a conveyance of title. Ruff v. Young, 354 Mo. 506, 190 S.W.2d 208; Zumwalt v. Forbis, supra; annotation 129 A.L.R. 11.

██ Upon the claim of undue influence it is urged that Mr. Oberman was old, friendless, and lonesome, drank to excess and "that his mind was in a condition to be unduly influenced by the defendant." Mabel Kindred's testimony is pointed to, Mr. Oberman's crying and saying that he had to let George have the place, George's statement that he was going to make "the old man" let him have the place, his hurry to get to Cape Girardeau that the deed might be executed before Mr. Oberman changed his mind, and it is urged that this evidence demonstrated activity on George's part. The deed was not recorded until after Mr. Oberman's death and, it is said, was concealed from the brother and sister and that the consideration was inadequate. It is urged that all these circumstances constitute "indirect evidence" of undue influence. It may be conceded, if certain other factors were present, that these circumstances would be corroborative of undue influence, Bohnsack v. Hanebrink, Mo., 240 S.W.2d 903, but considered singly or as a whole they may prove opportunity and arouse suspicion but they do not cogently demonstrate the overpersuasion, coercion, force or deception, breaking or overpowering the will of the grantor, required to establish that the deed was executed and delivered by reason of undue influence exerted by the grantee. Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59. Old age, weakness of mind due to arteriosclerosis, opportunity, request to convey, presence of the grantee when the deed was executed, are all corroborative circumstances but they do not in and of themselves prove undue influence in the execution of a deed. Lastofka v. Lastofka, 339 Mo. 770, 787–788, 99 S.W.2d 46, 56; McCoy v. McCoy, 360 Mo. 199, 209–211, 227 S.W.2d 698, 704–706; Ruff v. Young, 354 Mo. 506, 513, 190 S.W.2d 208, 211. So it is with the consideration and the fact of recording after death, they may be circumstances, but consideration is not, in the absence of other factors, essential to the deed's validity, Binnion v. Clark, supra, and, as indicated, the fact of recording after death does not establish undue influence.

██ It is urged in connection with the noted circumstances, however, that there was a confidential relation between George and his father and that, therefore, the trial court's finding was supported by substantial evidence. Dimity v. Dimity, Mo., 62 S.W.2d 859; Bohnsack v. Hanebrink, supra. But upon this record there is no convincing proof of a confidential relationship, George rented the farm from his father, sometimes cashed his old age pension checks, and the father was the son's deputy in connection with his lock box, but, in addition, there is no proof, whatever the nature of their relationship, that the relationship was exerted to the end that Mr. Oberman's will was overpowered and that he executed the deed by reason of undue influence. Hamilton v. Steininger, supra; Lastofka v. Lastofka, supra. All in all, the facts and circumstances shown and relied upon by the plaintiffs are not of the required force and character to establish that the deed was not delivered or that it was procured by undue influence exerted by the grantee son, and, accordingly, the judgment is reversed and the cause remanded.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All concur.