Anna GAUGH, Bertha Heilman, Isabella Bennett, Ernest Miller, Carl Klink, Lorain Klink, and Vester Klink, Appellants,

v.

Hale WEBSTER and Ethel Webster, Respondents.

No. 45199.

Supreme Court of Missouri.

Division No. 2.

Dec. 10, 1956.

Motion for Rehearing or to Transfer to Court en Banc Denied Jan. 14, 1957.

---

William M. Stringer, Moberly, Don C. Carter, Sturgeon, for appellants.

Hunter, Chamier & Motley, Moberly, for respondents.

BOHLING, Commissioner.

Equity to set aside a warranty deed, executed by Mrs. Emma Whitten, since deceased, conveying a lot and two apartments, in Moberly, Missouri, to Hale Webster and Ethel Webster, husband and wife, defendants. Plaintiffs are grantor's heirs (collateral) at law; Anna Gaugh, Bertha Heilman and Isabella Bennett, Ernest Miller (sisters and a brother), Lorain Klink, Vester Klink, and Carl Klink (children of a deceased sister). The petition charged (1) mental incapacity and (2) fraud and undue influence. A second count sought partition of the real estate between the plaintiffs. Defendants' answer put in issue the material allegations of plaintiffs' petition.

Grantor's husband died June 2, 1924. Ernest Whitten, their only child, married in September, 1924, and he and his wife lived with grantor for a while. He died in October, 1945, without descendants.

The grantor died August 25, 1953, at the age of 82. The deed was executed and acknowledged July 6, 1953. It was recorded July 9, 1953. The recited consideration was "One Dollar, love and affection, and other valuable considerations." Also: "The grantor herein reserves unto herself a life estate in the above-described real estate; this deed being made in consideration of the fact that grantees herein shall care for and minister unto the said grantor for and during her natural life, and shall care for her in sickness and old age." "Revenue $5.50 Cancelled."

The lot and apartments were valued between $4,500 and $6,000. Grantor's other property, personal, was appraised at $2,770.93. It passed, subject to the payment of debts, under grantor's will, dated January 31, 1946, to her sister Isabella, the sole beneficiary, who lived in the State of California and was practically blind.

Plaintiffs adduced evidence that grantor's health had not been good for several years; that during the winter of 1948–1949 she was well one day and ill the next; that she suffered from vitamin deficiency, dizziness and pernicious anemia, was emaciated; that for several days in January, 1953, she received treatments at the hospital. The important period here is from June to August, 1953.

E. T. Whitaker, doctor of osteopathy, operated the Whitaker hospital in Moberly. He was plaintiffs' witness. He testified grantor first entered his hospital August 21, 1951, and was dismissed September 5, 1951. He diagnosed her ailment as vitamin deficiency. She next was in the hospital from September 28 to October 2, 1952, complaining of dizziness. He gave her "shots" at that time. Next, she was in the hospital from June 3 to June 13, 1953. His diagnosis was the same, with gastritis. He called at her home a few times. She was in

the hospital from June 24 to August 2, 1953, when she went home for a day, returned August 3rd and remained until her death August 25, 1953. The doctor stated grantor's temperature into the record. It varied between 96.2 and 100, axillary (corrected temperature being one degree greater), between June 24th and July 7th. He made a "rough guess" that thereafter grantor's temperature varied and was below average, which indicated weakness, "quite ill. * * They've lost their ability to cope." Grantor wanted to return home, and the Websters were permitted to take her home about 6 p. m. August 2nd. Grantor's temperature varied on August 2nd between 98.2 and 99.8; and when she returned at 6:50 p. m. August 3rd her temperature was 102. He stated: "At times she was just as clear as you and I, and other times she definitely didn't know what she was doing." This was due to a toxic condition, poisoning of the system, which he later found out was caused by "a malignant condition of the liver and pancreas." He thought this condition had existed since 1951. She was able to be up and about the room, the hall and bathroom part of the time; the last entry of her going to the bathroom being August 8th. All the time he knew her she was emaciated. He estimated her weight at 110 pounds. He stated that from his observations and treatment of grantor from 1951 up to and including July 6, 1953: "My opinion from the record on the 6th of July is that she was competent," and that she "very definitely" knew people.

Gladys Meals, doctor of osteopathy and house physician at the hospital, testified that while grantor was last in the hospital, she was very sick, very thin, complained of being dizzy, and was helped to and from bathroom. Her trouble was diagnosed as anemia, wasting of the red blood cells, a slowly progressive condition. "We thought she had cancer of the liver and spleen." They "did not post her." All restless patients were supplied with bed railings. She could not say when railings were placed on grantor's bed. Grantor at times was all right

mentally and at other times was "irresponsible for what she said, anyway"; "Perhaps I'd say she had hallucinations," which would come and go. They gave grantor sedatives and medication. She stated: "Well, yes, at times" grantor was not capable of making a deed. The witness did not remember grantor's condition on July 6, 1953.

Mrs. Anna Gaugh of Lenzberg, Illinois, and her daughter Annice Eccles of Houston, Texas, sister and niece respectively of grantor, stopped in Moberly on July 20 and 21, 1953, and called on grantor at the hospital four times. Their testimony is much the same. Grantor was very sick and did not recognize her sister or Annice, who had stopped by to see grantor in 1951. There were no railings on grantor's bed on the afternoon or evening of the 20th. Annice said that on the evening of the 20th grantor seemed to recognize her sister, who told her that "Annice" was with her, and grantor said: " 'Yes, my niece from Texas.' " Later in the evening grantor appeared not to know them. They returned about 11 a. m. July 21st. Grantor's bed railings were up; she was raising her arms and throwing them from side to side and babbling about the nurses and disturbances, and the telephone ringing and no one answering it. They called again on the afternoon of the 21st and grantor's condition was much the same.

Mrs. Ethel Davis was the former wife and widow of grantor's son. Grantor and she visited back and forth. She visited grantor once a week or oftener and did things for her. The Davises took grantor down town weekly to purchase her groceries. She visited grantor every day at the hospital, except for three weeks, beginning July 11th, while away on her vacation. On July 10th she told Mrs. Webster that the doctor said grantor had cancer. Mrs. Webster mentioned the deed to her once after her return, August 3rd, stating "it came as a surprise to them, that they didn't know she was aiming to do that at all." Grantor said nothing to her about the deed. Grantor always had been easily persuaded; "thought

a lot of" Isabella, and liked the Websters, who were good neighbors and did things for grantor. Mrs. Webster was at the hospital almost every day; and she and witness did what they could for grantor at the home and at the hospital.

Mrs. Ursula Grotjan visited grantor at the hospital twice the latter part of July, 1953. She thought grantor recognized her and had forgotten whether grantor called her name. Mrs. Webster was there caring for grantor. The Websters called on her in 1954 and she told them that grantor had told her she wanted them to have $500.

Plaintiff Lorain Klink, grantor's niece, visited grantor frequently. She saw grantor at her home on June 13, 1953, and grantor told her she was " 'awful sick and hardly able to take care of myself.' " There was no one there at the time. When grantor returned to the hospital she visited her twice a week. Grantor was "quite ill," but always knew witness. Mr. or Mrs. Webster was at the hospital almost every time she was there. They told her on July 12th they were moving to grantor's apartment August 1st. Grantor told her the Websters were moving into her home and were to pay $35 a month. Neither said anything about a deed.

Clarence Clark, long acquainted with grantor, heard grantor tell his mother in May, 1953, that she wanted her sister Isabella to have her property.

Mrs. Gaugh identified a number of letters and post cards from the Websters, which plaintiffs offered in evidence. Under date of July 13, 1953, they informed Mrs. Gaugh that grantor was in the hospital, very sick; that the doctor stated the situation indicated cancer and gave her shots to relieve pain, and that grantor asked her sister to thank the daughter for writing. August 3rd, Mrs. Webster wrote Isabella that they had been informed about two weeks before grantor had "cancer in the worse stages"; that they did not expect her to ever be much better; that grantor confided in her and wanted "me to help her fix things" but she was

afraid grantor had waited too long; that grantor asked them "to move into her apartment and pay her $35 a month the rest of her life and she would see that we got her place, so she made the deed over to us, but it's her home till she passes away." August 30th they wrote Isabella, stating, among other things, that grantor had Mr. Webster stay home from work one day and told him what she wanted to do.

We now take up defendants' evidence.

The defendants resided across the alley from the grantor. James R. McDonald and Annie McDonald, his wife, and Mrs. Lola Johnson were neighbors and friends of the grantor of long standing. They and one or two others testified to the following effect. The Websters were attentive and looked after grantor's needs, almost as a member of the home, for a long time, perhaps ten, fifteen or more years. Mr. Webster painted the house, fixed the roof, windows and fences, and took care of the garden and yard. Mrs. Webster called on grantor practically every day, prepared food for her, did her laundry and waited on her at the hospital. One neighbor, Mrs. Grace Maxey, testified that she prepared and took things to grantor on different occasions, and grantor would tell her it was not necessary for her to do that as Mrs. Webster did it for her.

Grantor told the McDonalds that the Websters were the best friends she had; that they did everything they could for her; and that she had asked them to move in to take care of her because she didn't have anyone else. Grantor told Mrs. Johnson that the Websters always came when she needed help and that she did not know how she could repay them for what they were doing. She told Mrs. Maxey on several occasions that "she didn't know what she would do without Mr. and Mrs. Webster"; "I don't know what I'd ever do without the Websters and I aim to see they are well paid." She always praised the Websters, never criticized them.

Mr. and Mrs. McDonald and Mrs. Lola Johnson visited grantor at the hospital on different occasions. Each testified that she was very sick but was all right mentally.

Grantor had consulted with C. M. Hulen, an attorney of Moberly, about legal matters. He prepared her last will in 1946, being named executor therein. Someone, he did not know who, called his office from the hospital, a week or ten days before July 6, 1953, and informed him grantor wanted to see him. He told them all right. On cross-examination, he thought the call was taken by his secretary, Mrs. Louise Martin. Several days later, Mr. Webster came to his office and told him grantor was wondering when he was coming to the hospital. He had seen Mr. Webster before but this was the first time he met him to know who he was. They went to grantor's room. Grantor sat up on the side of the bed and took some papers out of a table drawer. When she told witness what she wanted to do he asked Mr. Webster to leave the room, and only she and he were in the room when they discussed the matter. She told him she wanted to deed this property to Mr. and Mrs. Webster and reserve a life estate, and they were to take care of her the rest of her life and pay her $35 or $40 a month, he was not certain which, as long as she lived. He asked her whether she wanted a will or a deed, explaining that if she made the deed the property would not pass under her will to her sister. She said: " 'No, I want a deed, because a will will have to be probated,' and 'I want this deed so there won't be any question about them having the property when I die.' " He explained to her that if she made the deed the Websters would have to join with her if she wanted to sell the property. After his explanation, she said: "That's exactly what I want you to do." She told him "that Mr. and Mrs. Webster had been awfully nice to her; that they had been very attentive to her and she said that when she wanted anything done that Mr. and Mrs. Webster, either Mr. or Mrs. Webster, was always willing to do it,

and she couldn't pay them anything for it, and that they had been so nice to her that that's the reason why she wanted this property left like she wanted it." She showed him some American Telephone and Telegraph Company stock; also an insurance policy which she said would take care of her hospital bill. She had some other papers. He was not certain whether he copied the description from an old deed she gave him or got it from the abstractor's office. She anticipated going home and told him she wanted the Websters to move into her apartment so they could take care of her when she returned home. He asked her if she wanted the monthly payments the Websters were to make shown in the deed and, as he recalled it, she said "no."

He dictated the deed to Mrs. Martin, his secretary and a notary, and on July 6th, between 4:30 and 5:00 p. m., went to the hospital with her. He saw Dr. Whitaker at the hospital, told him what he was there for, and then Mrs. Martin and he went to grantor's room. He again explained the effect of the deed. Grantor sat on the side of the bed and signed the deed. Mrs. Martin corroborated Mr. Hulen, stating he assisted her to sit on the edge of the bed. Each testified that grantor stated that was what she wanted to do. He testified he "guessed" he was at the hospital 30 to 45 minutes that time. He did not see Mr. or Mrs. Webster at the hospital. He asked grantor if she wanted him to deliver the deed to the Websters and she said she did. Mrs. Martin notarized the deed.

Mrs. Webster came to Mr. Hulen's office the next morning in response to a telephone call from him. So far as he recalled, this was the first time he ever saw her. He informed her he had been instructed to deliver the deed and, at his suggestion, she instructed him to have it recorded. He mailed the deed to the recorder's office, and upon its return, delivered it to Mrs. Webster. He testified that the recorder put the Government stamps on the deeds he mailed to him and billed him for it, and he was sure he instructed him to put the $5.50 stamps,

indicating a sales price of $5,000, on the deed. He did not know how he arrived at the amount, "imagined" he just appraised it. The Websters did not pay the grantor any money so far as he knows.

He stated Mrs. Whitten had been in his office repeatedly; that her body was emaciated, but she was of "strong will"; "pretty good determination"; and at the times he saw her in the hospital "she was perfectly sound"; that she was in bed in the hospital, but whether she was "quite ill" was for the doctor; "Q. You wouldn't be able to say she was sick? A. I'd say she was in bed. That I could say."

■ Suits in equity are tried de novo upon appeal; appellate courts giving due deference to the findings of the chancellor resting upon conflicting parol evidence. Been v. Jolly, Mo., 247 S.W.2d 840, 853; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 703.

■ The cancellation of a deed by a court of equity requires clear, cogent and convincing evidence to justify such action. The burden of proof is on the affirmative, plaintiff, whether the issue be mental incapacity or undue influence. McCoy v. McCoy, supra, 227 S.W.2d loc. cit. 703, 706; Clark v. Leonard, Mo., 232 S.W.2d 474, 478, 481; Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 466; Walton v. Van Camp, Mo., 283 S.W.2d 493, 500; Key v. Kilburn, Mo., 228 S.W.2d 731, 737; Horn v. Owens, Mo., 171 S.W.2d 585, 591, 592; Early v. Koelbel, Mo., 273 S.W.2d 312, 317; Stallcup v. Williamson, 361 Mo. 440, 235 S.W.2d 318, 321. The mental incapacity or the undue influence must be operative at the time of the execution of the instrument. McCoy v. McCoy, Clark v. Leonard, Schneider v. Johnson, Key v. Kilburn, all supra.

■ To invalidate a deed the undue influence must be of such potency as to destroy the free agency of the grantor. Clark v. Leonard, supra; Horn v. Owens, supra; McCoy v. McCoy, supra, 227 S.W.2d loc.

cit. 706 [13]. The burden of going forward with the evidence may shift; and a presumption of undue influence, if in a case, may be overcome by evidence that the deed expresses the wish of the grantor and was his voluntary act. Horn v. Owens, supra, 171 S.W.2d loc. cit. 593; Been v. Jolly, supra, 247 S.W.2d loc. cit. 854 [8]; Early v. Koelbel, supra, 273 S.W.2d loc. cit. 317 [7].

■ We have said that old age, weakness of mind, opportunity, request to convey, presence of the grantee when the deed was executed, while corroborative circumstances, do not in and of themselves prove undue influence in the execution of a deed. Lape v. Oberman, Mo., 284 S.W.2d 538, 542 [6], citing cases.

On the issue of mental incapacity plaintiffs cite McCormack v. Berking, Mo., 290 S.W.2d 145, 150; McCoy v. McCoy, supra, 227 S.W.2d 703 [5, 6]; Walton v. Van Camp, supra; Allen v. Kelso, Mo., 266 S.W.2d 696, 702. The McCormack case was a will contest, tried before a jury, a law case, and the issue was whether plaintiffs made a submissible case on mental incapacity. We affirmed decrees upholding the deeds involved in the McCoy and Walton cases. Both parties appealed in the Allen case from a judgment granting plaintiff relief, and, upon review, we granted plaintiff additional relief. In the instant case, the trial court upheld the deed. Plaintiffs' cases do not establish error.

■■ Plaintiffs, without directing us to the record sustaining their contention, make points that the chancellor did not consider that the defendants were not related to the grantor; that grantor made a will in 1946 giving her property to her sister Isabella; that a person of impaired mind may be an easier victim of undue influence than one having a good mind; that this deed was to strangers in the blood, a pure business transaction. We do not find wherein the record discloses that the chancellor did not consider the matters mentioned.

Defendants had affirmative testimony that grantor was mentally competent at the time of the execution of the deed, as well as other testimony that she was of sound mind while in the hospital. Plaintiffs' witnesses Anna Gaugh and Annice Eccles, her daughter, testified to facts tending to establish that grantor was not competent on July 20 and 21, 1953, about two weeks after the execution of the deed. Dr. Gladys Meals stated grantor at times was all right and at other times was irresponsible; but she did not testify that grantor was incompetent the day she executed the deed. Dr. Whitaker, grantor's physician and plaintiffs' witness, stated it was his opinion that she was competent on the day she executed the deed. Grantor's daughter-in-law, Ethel Davis, and niece, Lorain Klink, testifying for plaintiffs, did not say grantor was incompetent. The chancellor correctly ruled the issue.

Plaintiffs cite on the issue of undue influence Powell v. Raleigh, Mo.App., 244 S.W.2d 387, 390; 18 C.J. 237, § 164 [26 C.J.S., Deeds, § 62]; Welch v. Welch, 354 Mo. 654, 190 S.W.2d 936, 937; McCormack v. Berking, Mo., 290 S.W.2d 145, 150 [6]; Dingman v. Romine, 141 Mo. 466, 476, 42 S.W. 1087, 1089. The Powell, Welch and McCormack cases were will contests, tried by juries, law cases; and the question for determination was whether plaintiffs adduced sufficient facts to justify the submission of the issue of undue influence to the jury, the ruling in each instance being that a submissible case had been made. That is not the instant issue. The decree in the Dingman case set aside the deed involved but the facts in that case clearly distinguish it from the instant case. A plaintiff may adduce sufficient evidence to present a question of fact on the issue of undue influence and still fall short upon the whole record of presenting facts compelling a finding of undue influence invalidating a deed—the issue for determination in this equity suit.

The plaintiffs contend there was no consideration for the instant deed. If so, the result might be different. See Frey v. On-

stott, 357 Mo. 721, 210 S.W.2d 87, 93 [7, 10]. In the instant case grantor informed the attorney who handled her legal business what she desired to do. From her statements to him and to other witnesses the deed was her own desire. Grantor could make a gift of her property, and could attach conditions to the gift. We think defendants' evidence sufficient to establish a valid deed supported by a consideration. The recited consideration of "One Dollar, love and affection, and other valuable considerations" evidenced grantor's gratitude for services rendered by the grantees and, considered in connection with the condition that the grantees care for grantor in the future, exacted a promise for further performance. Clark v. Skinner, 334 Mo. 1190, 70 S.W.2d 1094, 1097 [4, 5]; Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, 467 [6, 7]; Wallace v. Brown, Mo., 165 S.W.2d 408, 410. Grantor died seven weeks after she executed the deed. In Reaves v. Pierce, Mo., 26 S.W.2d 611, 617 [9–11], the grantor in a somewhat similar deed died six weeks after its execution, and we considered the fact that his demise followed soon after the deed was not of itself a ground for cancellation.

Plaintiffs in their argument on undue influence attack alleged weaknesses in testimony on behalf of defendants; for instance, the statement in the letter of August 3, 1953, that grantor wanted Mrs. Webster "to help her fix things"; witness Hulen's refusal to testify that grantor was sick and failure to inquire concerning the grantees' willingness to assume the obligations stated in the deed and make the $35 monthly payments, et cetera. We think some additional facts might have been developed by defendants or, if desired, by plaintiffs on cross-examination, and some statements of defendants' witnesses not free from attack. However, the burden rests with a plaintiff to establish undue influence in the trial court and of demonstrating prejudicial error upon a plaintiff's appeal. We deem the matters mentioned not determinative; and, giving deference to the findings of the chancellor, we cannot say upon the whole record that plaintiffs' case on the issue of undue influence was established by clear, cogent and convincing evidence.

The judgment is affirmed.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BOHLING, C., is adopted as the opinion of the court.

EAGER, P. J., STORCKMAN, J., and JAMES W. BROADDUS, Special Judge, concur.

LEEDY, J., not sitting.