Frank P. SEBREE, Administrator with Will Annexed of the Estate of Sarah Rosen, Deceased, Morris Rosen, Rose Silverman, and Meyer Rosenwasser, Appellants-Respondents,

v.

Jacob ROSEN, Jacob Rosen, As Trustee of the Trust Estate Created under and by Virtue of the Purported Inter Vivos Trust Agreement of Pete Rosen and Sarah Rosen, Dated May 22, 1952, and Trust Agreement Supplements Thereto Dated July 24, 1953, and February 27, 1954; Jacob Rosen, As Executor of the Estate of Pete Rosen, Deceased, Betty Rosen, Sue Hyken, Carl Hyken, Mary Bodney, Bernard Bodney, Sam Rosen, and Avrom Rosen, Herbert Rosen, Joyce Rosen, Beverly Hyken, David Rosen, and Mary Sue Rosen, Pro Ami, Respondents-Appellants,

Raymond Rosen and Charlotte Rosen, Pro Ami, Sylvia Bain, Dorothy Hyken, Melvin Silverman, Sarah Lena Mendelsohn, and Dorothy Rosen, Respondents.

No. 47330.

Supreme Court of Missouri,

Division No. 2.

Sept. 11, 1961.

Motion for Clarification and Modification of Opinion Denied Oct. 11, 1961.

---

Terence M. O'Brien, Daniel S. Millman, Kansas City, for Frank P. Sebree and others.

Walter A. Raymond, Kansas City, for Jacob Rosen and others.

BOHLING, Commissioner.

■ This review involves controversies between the children, heirs at law, of Pete and Sarah Rosen (formerly Rosenwasser), with other descendants of said Pete and Sarah having contingent interests joined as parties defendant. The trial was under an amended petition of fourteen counts. A separate trial was ordered on Count XIV, the court retaining jurisdiction thereover. The record is lengthy.[1] It is not possible to refer to all of the many and varied factual situations and statements of the deceased settlors within reasonable limits. The purpose of the suit was to set aside an inter vivos trust agreement, including supplements, and certain other deeds and agreements of the parents or the survivor, and to recover and decree title to specific real property, for damages, and other relief. Some defendants, children of plaintiffs, joined in the allegations and prayers of plaintiffs' petition. The decree

was, generally speaking and so far as material here, in favor of the defendants, subject to exceptions presently noted. Plaintiffs have appealed and present issues involved only in Counts I, III, VII, and VIII of their petition. Defendant heirs, their spouses, children, and attorneys have appealed and attack that portion of the decree on Count III removing the settlors' surviving trustee, Jacob Rosen, and appointing the City National Bank and Trust Company of Kansas City, Missouri, as successor trustee, and they also attack on the ground of inadequacy that part of the decree awarding $20,000 out of the trust estate to each of the two attorneys for the defendants. Count I involves the validity of a trust estate consisting of real property appraised at $545,741. The appeals come to this court. Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 52 S.W.2d 839 [1].

■ Defendants have filed a motion to dismiss plaintiffs' appeal for violations of Civil Rule 83.05, V.A.M.R. We find the brief of plaintiffs-appellants subject to criticism, as is also defendants-appellants' brief. However, we conclude that the interests of justice require a decision on the merits. Civil Rule 83.09. Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 373 [3], 63 A.L.R.2d 504. The motion to dismiss is overruled.

Pete and Sarah Rosenwasser lived in Warsaw, Poland, with their children Meyer, Rose, Morris, Mary, and Charles. Pete came to Kansas City, Missouri, in 1910. Sarah and all the children except Meyer, the eldest, who had to be left behind on account of a scalp rash or disease, joined him here in 1913. The family name was changed to "Rosen." Jake, Sam, and Sue Rosen were born in the United States. Meyer, who came to the United States in 1920, uses the original name, Rosenwasser. Charles never married, had

---

1. Thirty-one court days were devoted to hearing the merits. The record here, which includes the hearing on allowances to the attorneys, consists of about 4,500 typewritten pages, covering the testimony of 69 witnesses and 607 exhibits, separately filed, with 299 requested findings of fact and 199 requested conclusions of law. The briefs filed here approximate 400 pages in length.

no children, and was killed during World War II.

Pete died at the age of 71 on June 14, 1954, and Sarah, 74 years old, died November 17, 1954.

The plaintiffs are Morris Rosen, Rose Silverman, and Meyer Rosenwasser (sometimes referred to as "plaintiff heirs"), and Frank P. Sebree, as administrator of the Estate of Sarah Rosen, deceased.

The defendants are Jacob Rosen, as trustee of an alleged inter vivos trust agreement of Pete Rosen and Sarah Rosen, and two supplements thereto, as executor of the estate of Pete Rosen, deceased, and individually, Betty Rosen (Jake's wife), Sue Hyken, Carl Hyken (Sue's husband), Mary Bodney, Bernard Bodney (Mary's husband) (sometimes referred to as "principal defendants"), Samuel Rosen, and fourteen other lineal or in-law relations of Pete and Sarah Rosen, including the grandchildren of the settlors, joined as parties defendant in Counts I and XIV on behalf of themselves and all others of their class yet unborn.

Plaintiffs Morris Rosen, Rose Silverman, and Meyer Rosenwasser, and defendants Jacob Rosen, Sue Hyken, Mary Bodney, and Samuel Rosen are all the surviving children of Pete and Sarah Rosen. We frequently refer to the parties by their first names.

I. Counts I and VIII. The evidence bearing on Count I and Count VIII overlaps.

Count I is an action (a) to set aside an inter vivos trust agreement executed by Pete Rosen and Sarah Rosen, and supplements thereto, collectively referred to as the "big trust," on the alleged grounds that Pete Rosen, Jacob Rosen, Betty Rosen, Carl Hyken, and Sue Hyken fraudulently conspired to and did unduly influence and trick Sarah Rosen into executing the same to obtain preferential treatment in the benefits and assets thereof; and (b) for ancillary relief.

The big trust, the original inter vivos trust agreement "by and between Pete Rosen and Sarah Rosen, husband and wife, hereinafter called the 'Settlors,' and Dr. Jacob Rosen and Pete Rosen, hereinafter called the 'Trustees,'" was executed and recorded on May 22, 1952, and the supplements thereto, with warranty deeds transferring additional property of the settlors to the trustees, of July 24, 1953, and February 27, 1954, were recorded August 3, 1953, and March 1, 1954, respectively. The corpus of said trust consisted of entirety estates held by Pete and Sarah in real estate. Pete and Jake were named joint trustees and, upon Pete's death, Jake became the sole trustee. The power of revocation and the right to withdraw or add assets to the trust estate were reserved only during the lifetime of Pete. It contained a spendthrift provision. It was to continue for twenty years after the death of the surviving settlor, the settlors or said survivor being the sole beneficiaries for life. It provided for the distribution of the net income. The remainder interest in the income for the twenty-year period and the corpus upon termination were to be distributed to the settlors' children as follows: Jacob Rosen, 30% of net; Morris Rosen, 15% of net; Sue Hyken, 15% of net; Mary Bodney, 15% of net; Meyer Rosen, 10% of net; Samuel Rosen, 5% of net; Rose Silverman, 10% of net; or to the lineal descendants, if any, per stirpes, in the event of the death of any of said remaindermen, otherwise to swell the shares of the surviving remaindermen or their lineal descendants.

Plaintiffs in seeking to set aside the big trust stress the disparities in the distributions made by the settlors.

Count VIII is an action based on a fraudulent conspiracy between Jacob Rosen, Betty Rosen, Sue Hyken, Carl Hyken, Mary Bodney, and Bernard Bodney to unduly influence, misrepresent, coerce, and trick Sarah Rosen into executing a written document, dated July 13, 1954, referred to as the "forgiveness agreement,"

purporting to forgive, release, and annul various receivables, face amount $46,000, owed Sarah and allegedly now owed the estate of Sarah Rosen, deceased, by said defendants and by plaintiff Morris and his wife, Dorothy Rosen; to set aside a purported warranty deed to Mary Bodney of real estate described in a contract to sell said real estate, on which there remained a balance unpaid, which constituted a receivable described in said forgiveness agreement; to set aside all purported satisfactions of said receivables, including the aforesaid contract of sale, and cancellations of deeds of trust securing said receivables, whether recorded or not; and to restore the same to full validity and enforceability against the respective makers thereof, and for ancillary relief.

The appealing defendants in their joint and several answers admitted certain allegations of the different counts in plaintiffs' petition but, as stated by plaintiffs, denied some of the formal allegations and all the effective allegations of the petition with respect to each count involved in this review.

By his will, executed February 24, 1954, Pete gave $5 each to Rose, Meyer, and Sam; then 25% of the remainder to Sarah; and distributed the balance of his estate as follows: 10% to Mary, 15% to Morris, 25% to Sue, 40% to Jake, and 10% to Jewish charities to be determined by his executor. Jake duly qualified as executor of Pete's estate.

■ All counts involved on this appeal are in equity and for trial de novo. We state our view on some general contentions of the parties.

■■ "Our review is with deference to the findings of the trial chancellor on irreconcilable, directly conflicting, verbal testimony on fact issues, and his findings are usually sustained unless the overwhelming weight of the evidence appears to be against them. * * * The rule does not extend to evidence in the form of depositions * * * or documents * * *." Creek

v. Union Nat. Bank, Mo., 266 S.W.2d 737, 747[1, 2]. See also Barr v. Snyder, Mo., 294 S.W.2d 4, 8[2–4]; Schlanger v. Simon, Mo., 339 S.W.2d 825, 828[1, 2]. The credibility of the witnesses is for the trier of the facts and the fact that witnesses are not contradicted is not decisive. Mueller v. Mueller, Mo., 318 S.W.2d 365[4–6]; Poole v. Campbell, Mo., 289 S.W.2d 25, 32 [16].

■■ The briefs make many references to the chancellor's findings of fact and conclusions of law, some without citations to the supporting evidence in the transcript. As stated in Lee v. Lee, 258 Mo. 599, 604 (I), 167 S.W. 1030, 1032: "In chancery the question is not what the chancellor instructed himself to do, or how he talked the matter over with himself; the question is: *Did he seek equity and do it?*" References to the chancellor's conclusions should be supported by references to the evidence establishing them.

■ Plaintiffs say the trial court erred in holding they had the burden of proving the allegations of Counts I and VIII by clear, cogent, and convincing evidence; that a clear preponderance of the substantial evidence is sufficient.

We have said repeatedly in equity cases involving fraud, undue influence, or mental incapacity: "Further, appellant seeks the cancellation of a deed. Such cancellation requires the exercise of the most extraordinary power of a court of equity, and it ought not be exercised except in a proper case, and the evidence to justify cancellation should be clear, cogent and convincing." Dillard v. Dillard, Mo., 266 S.W.2d 561, 563[2–4]. See Mueller v. Mueller, Mo., 318 S.W.2d 365[3, 11]; Gaugh v. Webster, Mo., 297 S.W.2d 444[2, 3]; Herrold v. Hart, Mo., 290 S.W.2d 49, 55[2, 11]. Hamilton v. Steininger, 350 Mo. 698, 168 S.W.2d 59, 68, reversing a decree setting aside deeds, states: "While we think the facts and circumstances in evidence in this case were sufficient for a jury in a

law case to draw the inference that Steininger induced, suggested or caused deceased to execute the deeds, they are not sufficient in our opinion that a court of equity should draw such an inference in view of all the evidence in the record." See Early v. Koelbel, Mo., 273 S.W.2d 312, 317[2, 5, 6].

Plaintiffs' cases involved jury trials (Winn v. Matthews, 235 Mo.App. 337, 137 S.W.2d 632[2, 3]; Rex v. Masonic Home, 341 Mo. 589, 108 S.W.2d 72[10, 11]; Berkemeier v. Reller, 317 Mo. 614, 296 S.W. 739[16]). The dictum in Wann v. Scullin, 210 Mo. 429, 109 S.W. 688, 704: "* * * In a suit in equity much less is required to sustain the charge of fraud than in an action at law for fraud and deceit," is an observation we do not find repeated in later cases. Plaintiffs' authorities do not establish error.

Plaintiffs say the chancellor "erred in refusing to hold a presumption of undue influence arose from confidential and fiduciary relationships proved, which constituted substantial evidence placing the burden of proof on principal defendants."

■ Plaintiffs' case of Loehr v. Starke, Banc, 332 Mo. 131, 56 S.W.2d 772, 776[3], held that where substantial factual evidence permitted of a legitimate inference, raised a factual presumption, of undue influence, the issue remained in the case and did not disappear upon the introduction of rebutting testimony. Proof of a confidential relationship, without more, does not raise an inference of undue influence or fraud, or shift the burden of going forward with the evidence upon the beneficiary, or authorize the cancellation of the instrument. The Loehr case, supra, 56 S.W.2d 778[6]; Horn v. Owens, Mo., 171 S.W.2d 585, 592[15]; McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 706[14–19]; Buckner v. Tuggle, 356 Mo. 718, 203 S.W.2d 449, 452 [1, 3]. Plaintiffs' cases of Pulitzer v. Chapman, 337 Mo. 298, 85 S.W.2d 400, 409[3], and Been v. Jolly, Mo., 247 S.W.2d

840, 854[4–11], are not out of harmony with the holding in the Loehr case.

■ "[I]nfluence to be undue must arise to the mark of such overpersuasion, coercion, force or deception as breaks the will power of the person overinfluenced and puts in its stead the will of another. * * The law does not ban as undue the natural influence of affection or attachment or the desire to gratify the wishes of one beloved and trusted. * * *" Horn v. Owens, supra, 171 S.W.2d 592[12]. See also Glover v. Bruce, Mo., 265 S.W.2d 346, 353[6, 7]; Rich v. Baer, 361 Mo. 1048, 238 S.W. 2d 408, 415[8].

Horn v. Owens also states (supra, 171 S.W.2d loc. cit. 593): "Notwithstanding the confidential relation between decedent and the defendant [granddaughter], the defendant in urging the conveyance or the gift had the right to exercise influence so long as it was not so coercive or importunate as to deprive decedent of her free agency." See also Phelan v. Gockel, Mo., 278 S.W.2d 758, 764[4].

■ The undue influence must be present and sufficient to destroy the free agency of the grantor at the time of executing the instrument to invalidate it. McCoy v. McCoy, supra; Clark v. Leonard, Mo., 232 S.W.2d 474, 478[2]. Consult Lape v. Oberman, Mo., 284 S.W.2d 538, 542[5].

In Holland v. Anderson, Mo., 196 S.W.2d 175, 192; Shafer v. Hatfield, 359 Mo. 673, 223 S.W.2d 396, 401[3], and Hershey v. Horton, 322 Mo. 484, 15 S.W.2d 801, 808 [2], cited by plaintiffs, the decree cancelled the deeds. Consult Sullivan v. Winer, Mo., 310 S.W.2d 917, 922; Phelan v. Gockel, supra; Rich v. Baer, supra, 238 S.W.2d 408, 414[7, 8], affirming decrees sustaining the deeds.

■ The parties agree that fraud and undue influence may be inferred from facts and circumstances. Herrold v. Hart, Mo., 290 S.W.2d 49, 55[6, 7]. Mere suspicion or opportunity is not sufficient. McCoy v.

McCoy, supra, 227 S.W.2d 698, 705[12, 19]; Ulrich v. Zimmerman, 349 Mo. 772, 163 S.W.2d 567, 574[12].

The chancellor considered the plaintiff heirs, their descendants and spouses competent witnesses and defendant heirs and their spouses incompetent witnesses under Section 491.010 RSMo 1959, V.A.M.S., the "Dead Man's Statute," to acts or statements of Pete and Sarah bearing on the validity of the instruments involved. There is much hearsay testimony on behalf of plaintiffs, admitted over objections, of statements of decedents, Pete and Sarah Rosen, before and after the execution of the instruments involved, which was admitted to show only the state of mind of the speaker, his or her feelings toward the plaintiffs or defendants and susceptibility to fraud or undue influence, and not as substantive evidence of the truth of the facts in the statements. State ex rel. Smith v. Hughes, 356 Mo. 1, 200 S.W.2d 360, 361 [2]; Edinger v. Kratzer, Mo., 175 S.W.2d 807, 814[15, 16].

Pete first had a small shoe repair shop and second-hand shoe store. In the early 1920's he was operating two stores and becoming interested in real estate. Sarah was at the old store. He later operated other stores. For two or three years Pete and Sarah operated a store in Sedalia, selling out to Morris and returning to Kansas City in 1942. Soon after 1942 Pete devoted his time to dealing in real estate. He would purchase equities, taking the title in Sarah's and his names by the entirety, in income producing properties, usually "cheap properties," and let the income pay the taxes, mortgages, and upkeep. In the 1940's Jake, and a little later, about 1946, Carl began investing in partnership with Pete and Sarah in real estate. Carl qualified himself as a real estate agent and through Pete's efforts became associated with the Moffett Realty Company, managing the properties of Pete and Sarah and other members of the Rosen family. Pete understood real estate and worked with and taught Jake and Carl his method of operation.

The family first lived in the rear of the first store, but in 1943 or 1944 Pete and Sarah moved to their six-apartment building at 4006-8 Main, occupying an apartment on the first floor until their deaths. Sue and Carl had an apartment across the hall. Later, perhaps after Sarah broke her hip in 1948, a doorway was made in the kitchen between the two apartments. In 1948 Mary and Ben moved into one of the upstairs apartments and, when Sue and Carl moved to their new home about 1952, they moved to the vacated first floor apartment. Plaintiffs state "neither Sue nor Mary paid rent." The transcript reference discloses: "Q. She [Sarah] did say, I think you testified, that Mary got free rent, isn't that right? A. No, she never told me that."

Pete was intelligent and successful in business. He officiated at Jewish high holy days; read and wrote "Jewish"; spoke, understood, and read printed English. According to plaintiffs he was a robust, healthy, strong-willed, arrogant man, tolerating no questioning; his decisions were his own, and not the decisions of his family or friends; Jake, Sue, and Carl could not persuade him; he never displayed any affection for Sarah, belittled, insulted, cursed, and otherwise mistreated and abused Sarah.

The Moffett Realty Company managed the Rosen properties. Mrs. Fanny B. Moffett, widow of its originator and active in its management, testified she first met Pete and Sarah in 1943 or 1944 when Pete brought Sarah to the office and discussed the purchase of a piece of real estate; she saw them in her office and at their home on different occasions; Pete told her Sarah had taken care of the children, raised a large family, and worked hard in his stores until they accumulated enough money; knew how to cook for him and, for the last five years of his life, told her he tried to go home at or shortly after noon. Sarah never complained of Pete's treatment;

said Pete had enough money; wished he would take it easier, and after his death complained of being lonely. There was corroborating testimony from, among others, H. G. Pope, a lawyer who handled Pete's legal real property matters from 1945 until Pete's death, Vassie Hopkins, who performed maid service at the Rosen home once or twice a week for five years, Joseph S. Gardner, a neighbor, and Lonnie J. Wright, who contracted work on the Rosen properties. A will executed by Pete in 1950 gave all his property, real and personal, to Sarah and appointed Jake executor. This and other testimony, the many deeds to Pete and Sarah by the entirety, and Pete's wills (whether valid wills or not) lead to the conclusion Pete was not mistreating Sarah as plaintiffs would have us believe.

There was testimony, mainly from plaintiffs, their spouses, and children, that Sarah could not read or write, including numbers; that she spoke in Jewish and spoke English only in small words and sentences, very brokenly; that she could make change for small amounts, but not for a large bill, $5 or $10; and that she worked in Pete's stores from 1914 to about 1942, twenty-eight years. Disinterested witnesses, bankers, a doctor, lawyers, realtors, neighbors, maids, most of whom did not understand Jewish, testified to conversations with Sarah in English without complaint from her; that she spoke English with an accent, but could be understood without trouble. Sarah waited on customers in the stores, operated a cash register, and made change. As early as 1924 she was paying help at the home in cash and deducting purchases at the store. She made oral agreements for repairs on property they owned and for improvements at the home. From 1931 to 1954 she had an active checking account and, although her signature was an illegible scrawl, she signed her checks; had savings accounts, and would come to the bank for change at the store, the transactions being in English. We think Sarah was a woman of average intelligence and as time

passed that she spoke and understood English adequately for ordinary business transactions. Pete must have considered her qualified to protect their interests.

Plaintiffs had testimony that Sarah was not healthy; suffered from milk leg, which caused her to limp, from about 1914; fell and broke a hip in February, 1948, was in a hospital for a day or two and then at Jake's and Betty's home for six weeks, and afterwards used a cane or held onto something when walking. Dr. Elias E. Zirul, Sarah's personal physician, testified she was hospitalized from April 17 to May 2, 1952, for diabetes (20 years' duration, according to the doctor's history), a diabetic ulcer of the right leg, moderate hypertension and osteoarthritic pains. Subsequent hospitalizations (September 5 to 21, 1952, February 11 to 23, 1954, July 8 to 13, 1954, and November 5 to 14, 1954) were mostly for restabilization of patient's insulin, attributable to failure to stay on diet. Released November 14, 1954, ambulant and in good condition, Sarah's death on the 17th was clinically a cardiac problem. Attorney Charles Rubins testified Sarah was not an invalid when she executed the big trust in his office.

Jake became an osteopathic physician about 1935; attended Pete and Sarah, and administered insulin to Sarah daily at Dr. Zirul's direction for a number of years before her death.

Plaintiffs say Sarah's mental capacity was poor, referring to testimony of an in-law lay witness. Dr. Zirul testified her mind was clear up to the time she died, and lay witnesses for defendants testified her memory was very good.

Some plaintiffs had information of the big trust, which had been promptly recorded. Plaintiff Rose and her husband testified that about 1952 Pete told them Jake got a lawyer to make a trust for him which went into effect when Pete died; that the City National Bank and Trust Company was trustee, and all the children were equal; that he made it because Jake

told him people couldn't take your property away if you had a trust; that the lawyer wanted $600 for it; that he didn't know what it cost because Jake paid for it. There was corroborating testimony from plaintiff Morris, who stated that Pete told him early in 1952 that he went to lawyer Charles Rubins to make a trust. Rose testified Pete said he did not trust Rubins.

Plaintiffs and their relatives testified that on many occasions, before and after Pete's death, Sarah said she loved all her children equally. Some of the family were at Sarah's on the morning of Pete's funeral when Jake said he had found Pete's will and read it. Rose's husband testified Sarah then started to pound the table and scream (quoting plaintiffs-appellants' brief): "I don't care what your crazy father did, all my children are my flesh and blood, I want them all to be equal. I haven't got any five-dollar children, Jake, I want you to change it, do you hear, Jake, be sure, Jake, I don't care what your father said." Several plaintiffs' witnesses stated Jake said he would change Pete's will. Others testified Sarah said she had no "small coin" children and, on different occasions, "all my children are alike." Meyer testified Sarah did not understand the meaning of "percentages"; thought it was something like interest on money. Rose, Meyer's wife, and Morris's wife gave testimony that Sarah said Jake was taking Pete's place and was "the boss now." Rose testified Jake told Sarah Pete wanted her to have $200 a week, and Sarah answered, "I thought your father didn't love me"; and later that Sarah told her Jake was giving her $50 a week and putting $150 in the bank because she didn't need $200. Meyer's wife testified Sarah said "without my signature nobody can do anything" and later said Jake "didn't need her signature." Plaintiffs and their relatives testified that Sarah said Morris was her best son; he was handy with little things, like repairing things.

Plaintiffs say Sarah was afraid of Pete and of Jake; but other testimony from plaintiffs of equal weight warrants findings she spoke up in front of Pete and in front of Jake.

Disinterested witnesses testified that Sarah told them Rose neglected her and when Rose visited her she fussed at her, she couldn't do anything to please Rose; that Rose's visits "upset" her; that Meyer never came to talk to Pete and her; that Morris was a good boy, would do things around the house, but if he wanted money he should work for it; that Dorothy, Morris's wife, only stopped to see her once in a great while; that she liked all her children; that Betty was good to her, took her shopping, as did Sue. Dorothy told Sarah in the presence of one witness: "I don't kiss anybody's ————."

Plaintiffs say Sarah never understood the inter vivos trust, didn't know what properties were in it or the extent or value of the Rosen assets. Properties known as the Palace Hotel and 8th and Main were in the trust. The trust received $66,888.40 September 22, 1954, for the latter in an eminent domain proceeding. Plaintiff Rose testified Sarah told Jake the second day after Pete's death to see that Morris got the Palace Hotel " 'because he had no way of making a living,' " and Jake answered, " 'all right, all right.' " In September, 1954, Sarah in the presence of Jake gave Rose, Meyer, and Morris a $2,000 check each, stating, according to plaintiffs, the money was from the Main Street condemnation, and Jake did not correct her. These checks were from a joint bank account of Sarah and Jake.

In 1950 or 1951, Pete, in the presence of Sarah at the home, listed their real estate holdings, about twenty parcels, the amount owed and the value of the equity in each, to George L. Edwards, a broker, to obtain a loan, all of which was read aloud. These equities amounted to $150,000 to $200,000. Mrs. Moffett testified that on any number of occasions Sarah, Pete, and she discussed deeds and property transactions, like anybody else; that when she took Pete's and Sarah's acknowledgements to an instrument, she discussed the instrument with

them and always had personal knowledge of their signatures. One plaintiff admitted Sarah knew about certain properties. Attorney H. G. Pope testified that on a number of occasions Pete had him come to the home and Pete, Sarah, and he would discuss the transaction and Sarah would express her approval. Sarah told Dr. Zirul: "Don't worry, we got plenty money." There was other corroborating evidence. We think Sarah had an adequate knowledge of their property.

We are not impressed with plaintiffs' testimony that Pete would forge Sarah's signature. There is no evidence that Sarah's signature was forged on any instrument involved on this appeal.

Mrs. Moffett testified Pete brought Carl Hyken to her office in 1946 or 1947; that, over the years, Pete said Carl was like a son to him, knew how to run a business, could make money. He wanted Carl in the real estate business and after five years succeeded in getting Carl associated with the Moffett Realty Company. She testified that Pete wanted Dr. Rosen to see properties before he bought; that Pete said that Dr. Rosen was a capable man and he depended on him; Betty Rosen was very kind to Sarah, like a daughter; Sue was very attentive, looked after her mother; Morris wasn't as successful as the other boys, wasn't able to take care of himself, liked to drink too much, and he, Pete, wanted to arrange it so Morris would be taken care of; he didn't like some things about Dorothy; Rose wasn't very attentive to her parents, didn't come to see her mother very much, Meyer was successful and had plenty of money. Mrs. Moffett testified Sarah told her that Jake came past every morning and gave her insulin, and she didn't know what she would do without him; that Betty was very kind to her, just like one of her own children; that Carl was bright and witness ought to have him in her office, was nice to her and Pete; she didn't know what she would do without Sue and missed Sue after Sue moved; she felt better after Mary moved downstairs and she missed Mary

during the day. Pete told Mrs. Lois Silby he had children who would do anything for Sarah and him and other children who did not want to know about them.

Attorney H. G. Pope testified that soon after 1945 Pete instructed him to take transactions up with Jake Rosen and Carl Hyken; that Pete, Jake, Carl, and witness would meet and discuss the transaction; that Pete would ask the advice of Jake and Carl and it would be determined what was best to do; that this continued up to Pete's death; that Pete said he had a lot of confidence in Jake and Carl, and that Pete never instructed him to consult any of the other children.

There was testimony from one or more of the plaintiffs, particularly Rose and her husband, or members of their families that following Pete's death Jake, among other statements, said he made a trust for Pete to protect Pete's property against any lawsuit; that Pete didn't want it, refused to and he, Jake, paid for it; that he knew more about trusts than any lawyer because he helped Pete make a trust; that if it had not been for him Pete would not have made a will, that on June 14, 1954, the date of Pete's death, Jake pounded the table, said he was boss and wanted all the books and papers; that later Jake said Sarah did not understand the trust, nobody understood it except him; that, about five months before Pete's death, Carl said Pete was sick and had given him permission to do anything he wanted to do; that Sue said she could get things from Sarah by pestering her; that Mary told Rose a few months before Pete died they better watch Jake and Carl and when Rose asked what property was in the trust, Mary said it was no use, Jake and Carl would get it any way.

Plaintiff Morris Rosen served two terms in the Missouri Penitentiary for burglary and larceny, which upset Pete. Pete later told Morris to keep out of his sight, and Morris left home. Morris and his wife testified to the effect Jake said there was $57,-000 cash in Pete's lock box, whereas other evidence established there was no large

sum in Pete's box and his inventory showed personal property of only $8,418.06. Notwithstanding Morris's denials, there was evidence, including notations on checks at the time he cashed them, that he borrowed $1,000 from Carl in March, 1954, and other checks of Carl were issued to him in payment of partnership transactions between them and in settlement of their partnership affairs. Morris, his wife, and her sister testified that from about 1942 up to about Pete's death Morris gave Sarah $10 to $20 from week to week on Pete's and Sarah's household expenses. Sarah's bank records alone show that after 1931 she had ample funds in checking and savings accounts and was not dependent on $10 to $20 a week from Morris. A disinterested witness testified that when Morris and he were talking about the fact they could use $5,000 or $10,000, Morris said that Sarah was preventing him from getting that kind of money from Pete.

Meyer Rosenwasser testified he left home in 1928 after a violent quarrel with Pete over Morris; that, being the first-born son, he considered himself a double heir, entitled to twice as much as any other child, of Pete's and Sarah's property, and the trust should have been made that way. There was testimony that Meyer, throughout the years, held it against his parents for leaving him in Europe.

Plaintiff Rose and Morris Silverman eloped. This displeased Pete and Sarah. Each testified they visited Pete and Sarah two, three, or four times a week, prior to Pete's death, unless prevented by sickness. Rose testified that she visited Sarah almost daily thereafter; that upon taking Sarah in her automobile, she had to help Sarah up the steps to the apartment; that she saw the driveway at the apartment but did not know it led to the rear where one could enter and avoid going up the steps. They never went to Sedalia during the two or more years Pete and Sarah were there. Rose's husband testified that Pete "always told me the truth, I know that. Q. You say he always told you the truth? A. No, I wouldn't say that, he never did tell me the truth"; that he would never do anything to vilify Pete's name.

There was testimony that Sam left home after trouble with Pete. Sam became a doctor and lives in Detroit.

Attorney Charles Rubins testified that Pete, for whom he had performed legal work, after two discussions at Rubins' office in November and December, 1951, about preserving his real estate for himself and wife and their children so it would not be sold after their deaths, decided to have an inter vivos and not a testamentary trust, and instructed him to prepare it. Rubins, in response to Pete's request, went to the Rosen apartment in January, 1952, and different provisions of a trust were discussed by Pete, Sarah, and Rubins, and explained to them by Rubins. Rubins testified he understands but does not speak Jewish and their conversation was in English; that Sarah spoke in English and Jewish; that, among other things, Pete wanted the right of revocation as long as he lived; that Sarah, being asked, said that if Pete died she wanted it to stay the way it was; that he told them Pete could be trustee and they could have another trustee, and Sarah suggested Jake, saying he had taken care of the properties and knew about them; that Jake was agreed upon, and other provisions were discussed and agreed upon. Pete brought the names and distributions to the children to Rubins about two weeks before the trust was executed and then some one, Pete according to his best judgment, came in with the legal descriptions of the properties.

Upon finishing the document, Rubins, at Pete's request, delivered a copy to Pete and Sarah at their home, told them to read it and let him know what to do. Under arrangements made by Pete over the telephone, Pete, Sarah, and Jake came to Rubins' office in the early afternoon of May 22, 1952. Rubins testified that, with the exceptions of the caption and descriptions, he read all the provisions of the trust, a sen-

tence or two or a paragraph at a time, stopped and asked them if they understood it and if it was all right, and, upon each agreeing, continued in like manner until he finished the whole of the body of the instrument. Arthur J. Kase and Harold Waxman were called in. The trust was signed by Pete and Sarah (Kase and Waxman witnessing Sarah's "mark"), and by Pete and Jake as trustees. Waxman took Pete's and Sarah's acknowledgements and also had them swear to their signatures. Rubins testified Jake definitely had not discussed the trust with him; that, a few days before Pete telephoned, Jake asked him when his parents should come to the office to sign the trust; that Jake brought his parents to the office May 22, 1952; that, while not positive, he was of the opinion Jake was not in the room during the whole of the reading of the trust to the parents.

Mr. Waxman testified that over a six-month period prior to May 22, 1952, Pete and Jake, separately and sometimes together, on a half-dozen occasions, and Carl Hyken, alone, on one or two occasions came to Rubins' office. Rubins testified Waxman was wrong in stating Jake was in his office more than the one time, and was definitely mistaken in saying Carl was in his office at any time during said period. Rubins' firm received checks signed by Jake as trustee ($400 in May, 1953, and $1,050 in December, 1955) for drafting the trust and legal services.

On June 19, 1954, after a family discussion at Sarah's home arrangements were made for placing Sarah's checking and savings accounts in the joint names of Sarah and Jake.

Sarah executed her will on July 4, 1954. So far as material here, she directed the distribution of her residuary estate, real and personal, to her children in equal shares, and in a separate paragraph forgave and released unto her children and their spouses all sums owed by them to her, secured or unsecured, and directed the cancellation and delivery of all their obligations and any se-

curities therefor. She named Jacob Rosen as executor. The probate court denied Jake's application, and appointed Frank P. Sebree, who qualified, as administrator c. t. a. of the estate of Sarah Rosen, deceased. An action contesting Sarah's will is pending.

Mrs. Fanny Moffett testified that Sarah and Carl came to her apartment that morning and Sarah said she was there to sign her will. H. W. Moffett, Mrs. Moffett's son, and J. W. Edwards, of the same apartment building and who was called by Mr. Moffett, witnessed Sarah's will. Mr. Edwards testified that before Sarah signed the will she had the residuary and forgiveness (which covered the same obligations mentioned in the forgiveness agreement) paragraphs of her will read to her by Carl in their presence; that Sarah stated it was her will and requested them to witness it, and the will was then executed by Sarah and witnessed by Mr. Moffett and him. All this transpired in the English language. Mrs. Moffett returned to the room about the time the men were leaving, and she and Sarah discussed the will. Sarah told Mrs. Moffett that she knew what she was doing; that she had been over it half a dozen times; that Rose and Meyer had been over for two or three nights fussing with her about the way she was dividing her property, but she knew what she was going to do, and they would get their share out of the trust. Mr. Edwards testified that three or four days later he stopped at Sarah's home at her request and, after being informed he had heard about the trust Pete and she had made, Sarah said she had been thinking about her will and "wanted to make sure that the will she had signed didn't change this trust any." He suggested she consult the lawyer who drafted the trust and will.

There was testimony from plaintiffs that the principal defendants did not disclose Sarah's will to them, and that Sarah, sometime in August, said she had made a will and all children were equal.

What is known as the forgiveness agreement, involving $46,000, face amount, of receivables was executed July 13, 1954. Its provisions are stated hereinafter.

Following Pete's death, Sarah invited all her children, grandchildren, and great grandchildren to go with her to Canada, saying she didn't care what it cost. She later went, visiting a niece and her husband in Toronto, Mr. and Mrs. Charles Shore, taking Jake, two of his children, Sue and her daughter. Sidney Hyken, Rose's son-in-law, testified his brother Carl told him Sue had talked Sarah out of taking so many. Sarah told Mrs. Moffett she gave up taking all of her relatives on account of the expense and Sarah told Mr. Shore she was proud of Jake and he was with her on account of her diabetes.

Charles Shore testified by deposition that Sarah, while alone with his wife and him, told them that Pete and she had made a trust in 1952; Jake received the largest and Sam the smallest share because they did not like his marrying a Gentile; Pete and Jake were trustees and, after Pete's death, Jake was trustee; the trust was for 20 years, and the property remained in the blood of the Rosens, and Sarah expressed no dissatisfaction with the trust. He also testified Sarah told them Pete and she bought buildings with the children, taking mortgages for the children's part; that she didn't need the money after Pete's death and cancelled and gave the notes and mortgages back to the children; that he remembered she mentioned Morris but didn't remember it if she mentioned any other child.

Plaintiffs say that Sue, Mary, and Betty isolated Sarah from plaintiffs or would eavesdrop when they visited Sarah. Other testimony from plaintiffs' witnesses established that they visited Sarah when Sue, Mary, and Betty were not present. Meyer and his wife visited Sarah in the hospital in November, 1954, and Sarah was depressed because Jake, Mary, and Sue were not there.

Morris testified that Jake asked him to sign the forgiveness agreement, saying it was to give Mary property in the State of Kansas, and Dorothy, Morris's wife, stated that Carl delivered a copy to Morris and said Mary was the only one getting anything and the papers were useless. Morris said he read it but "didn't even look for signatures." Morris testified that, we understand in August, 1954, he went to Sarah's and asked Mary, who was there, about the forgiveness agreement, and Mary said, "You damn fool * * *. This way we get it all"; that Meyer was there and became very excited; that he, Morris, asked Sarah if she had been signing over mortgages, and Sarah answered: "I don't give nothing away"; that he said "Evidently you did"; that Sarah turned and ran him off the porch, saying "You get away from here," and Mary jumped up and said she was going down and beat hell out of Dorothy, Morris's wife.

Rose testified she received a copy of the forgiveness agreement about July 17th; that she talked to Mary and Mary said " 'They grabbed, I grabbed too' "; that Sarah told her she was not signing away her properties and not to listen to Morris " 'because they say' " he doesn't know what he is talking about; " 'all the children are alike,' " she only signed for taxes, insurance, and repairs; that was what Jake told her; that if she didn't believe her to get out; and that she (Rose) walked out. Meyer's wife and daughter and Rose's daughter Mrs. Bain gave corroborating testimony that Sarah said she was not signing away property. Meyer's wife and daughter testified, in effect, that they called on Sarah before 8:00 a. m., August 14, 1954, and Sarah complained about Mary's working at the store and not being with her; Jake came in about 10:00, gave Sarah a "shot of insulin," and Sarah then went into a rage and shouted for Jake to show them that she was not giving everything away; Jake, after stating if it had not been for him Pete would not have made a will, or left anything in trust for Meyer and Rose, took the big trust out

of his pocket, explained other details and, when asked about Rose's property, told them to get a "$25 lawyer" to explain it to them; that the family never did get along. Sidney Hyken testified that Carl said Sarah was willing to do whatever Jake wanted, and was dumb for destroying the notes and securities.

This case involves the credibility of the witnesses and the weight of their testimony, and the opportunity of the chancellor to observe the witnesses during this lengthy trial and better pass on these matters is to be accorded consideration. The plaintiff heirs and the principal defendants were not on friendly terms, and much of plaintiffs' testimony was hearsay and not substantive evidence of the fact narrated. Edinger v. Kratzer, Mo., 175 S.W.2d 807, 814.

Plaintiffs' charge is that Pete Rosen and defendants Jake Rosen, Betty Rosen, Sue Hyken, and Carl Hyken defrauded and unduly influenced Sarah Rosen into executing the big trust instruments. A preponderance of the evidence established that Sarah was mentally competent. We find no confidential relationship between Sarah and Sue or Carl Hyken or Mary or Ben Bodney or Betty Rosen other than that arising from their mother and daughter or mother- and daughter- or son-in-law relation. We find no substantial evidence of fraud or undue influence exercised by the last mentioned defendants upon Sarah in connection with her execution of the big trust instruments.

A confidential relation existed between Sarah and Jake. Jake accompanied his parents to lawyer Rubins on May 22, 1952, when they executed the big trust, and thereafter paid Rubins' firm for their services by checks against the trust funds, but this does not compel a finding of fraud or undue influence. Shapter v. Boyd, 327 Mo. 397, 37 S.W.2d 542, 550[7, 8]; Wright v. Stevens, Mo., 246 S.W.2d 817, 821 [4, 5]; McCoy v. McCoy, 360 Mo. 199, 227

S.W.2d 698, 707[20–23]. The findings of the chancellor establish that he did not believe the testimony on behalf of plaintiffs of admissions against interest or false statements about plaintiff heirs claimed to have been made by the principal defendants to Pete or Sarah. Any misrepresentation had no effect on Pete and Sarah. For instance, Morris shares in the big trust assets to the same extent as Sue and Mary and Sarah later accorded him equal consideration with the principal defendants in her will and the forgiveness agreement. Jake, notwithstanding the confidential relation, had the right to exercise influence so long as it was not so coercive or importunate as to deprive Sarah of her free agency. Horn v. Owens, Mo., 171 S.W.2d 585, 593[18].

There is no proof that any defendant unduly influenced or defrauded Pete. Sarah accepted Pete's judgment in business matters, and a confidential relation existed between them, husband and wife. No reason appears for her to act otherwise. There was no reason or necessity for Pete to unduly influence or defraud Sarah. Her approval could have been and we think was obtained by Pete after discussion and disclosure to her. They were on equal terms under the big trust during their joint lives, and upon Pete's death she succeeded to the whole of that joint interest. Attorney Rubins' testimony established that the terms of the trust were determined by Pete and Sarah after consultations with both settlors, and not by Jake or the other principal defendants. The power to revoke the trust on fifteen days' notice for the lifetime of Pete was reserved but was never exercised. Pete and Sarah placed additional properties in the trust on July 24, 1953, and, again, on February 27, 1954, thereby ratifying and confirming their execution of the original trust of May 22, 1952. Sarah, after executing her will on July 4, 1954, "wanted to make sure" her will did not change the trust and expressed no dissatisfaction with the trust while informing Charles Shore of its existence. She lived over two years after its execution, and

made no attempt to repudiate it. Ruff v. Young, 354 Mo. 506, 190 S.W.2d 208, 212. Giving consideration to the care and attention shown by this record to have been bestowed upon Sarah and Pete by Jake and Betty and by Sue and Mary; Pete's and Sarah's concern over Morris's inability to make a living; that Pete over the years consulted and secured the advice of Jake and Carl on his property transactions, which appear to have been extremely successful, the disparities in the participations of the children in the big trust assets appear based upon reasonable distinctions. The chancellor's finding that Sarah voluntarily executed the big trust is supported by substantial evidence. We fully approve the findings and decree of the chancellor upholding the big trust. McCoy v. McCoy, 360 Mo. 199, 227 S.W.2d 698, 706[17]; Ulrich v. Zimmerman, 349 Mo. 772, 163 S.W.2d 567, 574 [12], among others.

The $46,000 receivables in the forgiveness agreement, payable to Pete and Sarah, became the property of Sarah upon Pete's death. This agreement, executed July 13, 1954, and attacked in Count VIII, is signed by Jacob Rosen, Mary Bodney, Sue Hyken, and Morris Rosen. It states that the parties "are mutually indebted to the estate of Pete Rosen," are the "residuary heirs thereof," desire to cancel these indebtednesses and, "in consideration of the mutual promises of the parties," make a family settlement and agree to "waive and release any claims or rights that they might have to the proceeds of said indebtedness, if any, from said estate or from each other." It then specifically describes seven receivables due Pete and Sarah Rosen. It carries the following addendum: "I, Sarah Rosen, being a residuary heir, confirm, ratify and adopt the foregoing agreement," which is signed by Sarah.

Plaintiffs say Sarah signed merely as a residuary heir of Pete, and not as a party to the contract or owner of the notes, and the execution of the agreement with the representations that it was a contract between the residuary heirs of Pete's estate and that the notes belonged to Pete's estate, and the securing of Sarah's signature as a residuary heir of Pete's estate in itself evidences a fraud upon Sarah, who could not read.

Section 401.122 RSMo 1959, V.A.M.S., provides that the renunciation by a holder of a negotiable instrument of his rights against the maker "must be in writing, unless the instrument is delivered up to the person primarily liable thereon." Defendants point to the provision of Sarah's will directing the cancellation and renunciation of all indebtednesses due her from any of her children and their spouses, her endorsement of the notes listed in the forgiveness agreement, and contend Sarah made an inter vivos gift of said receivables to the makers.

Defendants do not question the existence of confidential relations between Sarah and Jake and Carl at the time of the forgiveness agreement. Following Pete's death and prior to the forgiveness agreement, Sarah's checking and savings accounts and U. S. bonds were placed in the joint names of Sarah and Jake, and Jake was her appointed sole deputy to enter her safe deposit box, her business advisor, her physician and son. He was active in securing the execution of the forgiveness agreement. These notes and deeds of trust securing them were in Sarah's safe deposit box on June 25, 1954, and were removed from the box, taken to Sarah for her endorsement and to the recorder's office for cancellation by Jake on July 13, 1954.

In re Kaimann's Estate, 360 Mo. 544, 229 S.W.2d 527, 529[5, 10], states: "The law in this state is that a son has the burden of proof of an alleged gift to him by his father in his lifetime. * * * '* * * [W]here the relation of trust or confidence exists, it [the gift] is presumptively void—and the burden is upon the donee to rebut this by showing the absolute fairness and validity of the gift, and that it is entirely free from the taint of undue influence. This sound and wholesome

doctrine applies as well to suits of law as to proceedings in equity, and is as broad in its scope as the existence of the confidential and fiduciary relation. * * *' Reed v. Carroll, 82 Mo.App. 102, loc. cit. 108." See Spencer v. Barlow, 319 Mo. 835, 5 S.W. 2d 28, 32; Nelson v. Hammett, Mo., 189 S.W.2d 238, 243.

■ The testimony of J. W. Edwards and Mrs. Moffett as to what occurred when Sarah executed her will on July 4, 1954, and of Charles Shore on Sarah's statements while in Canada about cancelling the notes of her children, mentioned hereinbefore in connection with the execution of Sarah's will and her trip to Canada, does not establish that her signing of the forgiveness agreement was free from fraud. Sarah's will (Carl was active in its execution), if upheld, will accomplish by express provisions what defendants seek to have accomplished by a construction of the forgiveness agreement. Section 401.122 does not relieve defendants of the burden to "show the transaction was fair and equitable." See In re Peterson's Estate, Mo., 295 S.W.2d 144, 151. The forgiveness agreement misrepresents the facts in stating that Jake, Mary, Sue, and Morris were indebted to Pete's estate on the receivables therein mentioned. Its consideration is the "mutual promises of" Jake, Mary, Sue, and Morris. Sarah signed as a residuary heir of Pete's estate, and not as the owner of any receivable. The agreement contains no provision whereby Sarah renounces her rights to or makes a gift of any receivable owed her. The testimony in this record on behalf of the defendants and the forgiveness agreement does not meet the burden placed upon them of establishing by competent evidence that Sarah signed said agreement, endorsed the notes and authorized their cancellation without fraud being exerted upon her. One of the receivables is a monthly installment option contract for the purchase of real property by Mary and Ben Bodney from Pete and Sarah Rosen. Under date of June 26, 1954, Sarah executed and acknowledged a warranty deed convey-ing this property to Mary "for and in consideration of the sum of One Dollar and other valuable consideration," paid and receipt acknowledged. The stated consideration tends to disprove the theory of a gift, or a consideration based upon love and affection. Wilkerson v. Wann, 322 Mo. 842, 16 S.W.2d 72, 75[5]. This deed was recorded July 19, 1954, six days after the execution of the forgiveness agreement. It is subject to the attacks the other receivables in said forgiveness agreement are subject to.

The judgment on Count VIII is reversed and the cause is remanded with directions to enter judgment in conformity herewith.

II. Count VII is an action against Jacob Rosen to enforce the so-called "little trust," seeking an accounting and a declaration of rights. Sarah made Jake joint owner of her checking and savings accounts and United States bonds, and on June 19, 1954, Jake voluntarily executed the little trust agreement, acknowledging that any such funds on hand at Sarah's death were held by him in trust for distribution equally to Sarah's seven children. Funds totaling $24,383.81 were in this trust at Sarah's death. Jake, out of said funds in 1955, paid Pete's 1954 federal income taxes, $3,424.48; Missouri income taxes, $301.01; Kansas income taxes, $16.91, and Pete's federal estate taxes, $15,342.90, a total of $19,085.30.

Plaintiffs claim these payments were improper as Jake had only a $\frac{1}{7}$ interest in the little trust whereas he had a 40% interest under Pete's will. Jake had a 30% interest under the big trust.

■ (a) The chancellor considered the income tax payments proper, stating Pete and Sarah filed joint federal income tax returns and consequently Sarah's estate was liable for Pete's unpaid federal income tax, citing 26 U.S.C.A. § 6013(d) (3), p. 307, Internal Revenue Code of 1954 (see I.R.C.1939, § 51(b) (1), 26 U.S.C.A. § 51 (b)(1)). The parties are agreed that

**884** ■ ⬛

Pete's and Sarah's income tax returns for 1952, 1953, and 1954 were partnership, not joint, returns and the chancellor was in error. See 26 U.S.C.A. § 701 (I.R.C.1939, § 181, 26 U.S.C.A. § 181), making partners liable for federal income taxes only in their individual capacities. We are directed to no authority for applying the little trust assets to the payment of Pete's federal or state income taxes. United States v. Hutcherson, 8 Cir., 188 F.2d 326, 331 [8], held that Missouri estates by the entirety are not subject to the lien authorized for collecting a husband's federal income tax.

(b) The $15,342.90 federal estate tax. The assets of Pete's probate estate were appraised at $8,418.06. The chancellor considered the big trust consisted almost entirely of real estate against which plaintiffs had a lis pendens in connection with this suit; that bad faith on Jake's part could not exist by reason of his 40% interest in Pete's estate as there was not sufficient funds therein to pay said taxes, and the only available funds for payment were the funds of the little trust. The trial court ordered the $5,-298.51 balance distributed under the little trust; and, under stipulation between the parties, this $5,298.51 was paid into the registry of the court pending the final determination of the litigation and the estate tax liabilities of the estates of Pete Rosen and Sarah Rosen, both deceased.

The Internal Revenue Code of 1954 became effective August 17, 1954. 26 U.S.C.A. § 7851(a) (2) (A). The I.R.C., 1939, was in effect at the time of Pete's death, June 14, 1954. The provisions of the two codes here involved are substantially the same, and may be found in 26 U.S.C.A. The property in the big trust was the result of Pete's efforts and earnings. The power to revoke the big trust was reserved therein for the lifetime of Pete, and there was no provision in Pete's will with respect to the payment of any tax. The seven children of Pete and Sarah are beneficiaries under the big trust and also the little trust.

In Carpenter v. Carpenter, 364 Mo. 782, 267 S.W.2d 632, 636 [1], the question was whether the federal estate tax under the Internal Revenue Code of 1939 on a non-probate asset of the decedent, an annuity contract in which decedent had reserved the right to change the beneficiary, was to be borne by the beneficiaries of said contract or charged against the residuary legatees in decedent's will, decedent's will being construed to contain no provision covering the payment of federal estate taxes on non-testamentary assets.

⬛ It is pointed out in the Carpenter case (267 S.W.2d 637) that what the federal estate tax law taxes is the interest which ceases by reason of the decedent's death and not the interest to which the beneficiaries or heirs succeed by reason of the death; that the statute (I.R.C.1939, § 811) provides that there shall be included in the "gross estate," in addition to decedent's real and personal property, revocable transfers, joint interests, estates by the entirety, et cetera (see I.R.C.1954, §§ 2038, 2040); that certain deductions from the "gross estate" are authorized for arriving at the "net estate" for computing the federal estate tax (I.R.C.1939, § 812; see I.R.C.1954, §§ 2043, 2053–2056); that the executor is required to pay the tax to the collector (I.R.C.1939, § 822(b); see I.R.C.1954, § 2002; 31 U.S.C.A. § 191); and that the statute provides for a lien upon the "gross estate" to secure the payment of the tax (I.R.C.1939, § 827; see I.R.C.1954, § 6324). The non-probate asset, the annuity contract in which decedent had reserved the right to change the beneficiary, was held to be a part of the decedent's "gross estate" for federal estate tax purposes. It follows that the big trust, subject to revocation during Pete Rosen's lifetime, was a non-probate asset of Pete's "gross estate" for federal estate tax purposes.

In the Carpenter case we prorated the federal estate tax between the testamentary and non-testamentary estate upon equitable principles, stating (267 S.W.2d 642): "We

have seen that there is nothing in the federal estate tax statutes to prevent a proper application of equitable principles to prevent injustice, where the tax is based upon both testamentary and non-testamentary property. * * * It is our conclusion that the federal estate tax should be prorated, as stated, and that the beneficiaries of the annuity should pay the tax attributable to their respective interests therein. * * *" See United States v. Traders Nat. Bank, 8 Cir., 248 F.2d 667, 670.

■■■■ The federal estate tax attributable to the big trust should be prorated among the beneficiaries in accordance with their respective interests therein. In the circumstances of this record the little trust should be made whole by refunding the $19,085.30; and since Jake acted in good faith and his payment of the $15,-342.90 federal estate tax stopped the running of interest thereon and, perhaps penalties (consult I.R.C.1954, §§ 6601, 6651), the adjustment should be upon equitable principles with appropriate steps taken to secure the ultimate payment by all beneficiaries of their respective shares of the federal estate tax discharged by said payment.

■■■■ Plaintiffs say Jake never alleged or asserted any claim against plaintiffs in the trial court in connection with the payment of the federal estate tax. The Carpenter case, quoted supra, considered the ruling "a proper application of equitable principles to prevent injustice"; and we hold this a matter affecting substantial rights within Civil Rule 79.04.

III. Count III, in the alternative if the big trust be held valid, is an action for (a) an accounting from the joint trustees up to Pete Rosen's death, June 14, 1954, and from the surviving trustee, Jacob Rosen, thereafter, and for the appointment of a referee to take said accounting; (b) for recovery from Jacob Rosen, individually and as executor of the estate of Pete Rosen, deceased, of all losses to and improper disbursements from said trust estate; (c) for forfeiture of all compensation withdrawn by the joint and surviving trustees from said estate; and (d) for the removal of Jacob Rosen as the trustee because of mismanagement, misconduct, and fraud.

The court removed Jake as trustee on the ground that the hostility existing between the plaintiffs, representing 35% of the beneficial interest in the trust, and the trustee prevented the trust purposes being effectually administered, and appointed the City National Bank and Trust Company of Kansas City as trustee, the settlors' named successor trustee upon the death of the individual trustees. The trial court retained jurisdiction to superintend and enforce the accounting between the removed and successor trustees and to determine any and all issues arising in connection therewith. Both sides have appealed. Plaintiffs contend additional grounds, involved in any accounting between the trustee and his successor, exist for the order of removal. Defendants claim the appointment of a successor trustee was error.

■■■ (a) In October, 1954, a furnace was installed on property in which Jake and Betty owned the fee but one-half of said fee was in remainder, subject to a life estate in Sarah. Sarah's life estate was in the big trust. The furnace cost $3,666.68 and had a life of 25 years. Notwithstanding Sarah's death on November 17, 1954, Jake had the big trust pay $1,833.34 on the cost of the furnace, payments being made in November, December, January, and February. Sarah lived for about a month after the installation of the furnace. The apportionment of one-half of this cost to the trust was improper.

■■■ (b) Plaintiffs claim Jake failed to establish the following payments as proper charges against the big trust, to-wit: $1,500 for the Karbank-Moffett appraisal, and $3,000 for the Skeer-Flanagan appraisal of properties constituting a part of the federal

estate tax return in the estate of Pete Rosen, deceased, and also $6,000 to Roven and Bold, accountants. There was evidence of record that this $6,000 total included payments for services in connection with the federal estate tax return and the federal, Missouri, and Kansas income tax returns in the estate of Pete Rosen, the preparation of three reports to the big trust beneficiaries, bookkeeping in connection with the big trust, and the preparation of income tax returns for Jake. Defendants direct us to the chancellor's refusal of plaintiffs' requested findings of fact to the effect that the above items were not chargeable against the big trust. In view of the documentary evidence that these payments were so charged and evidence that they were not incurred, at least in part, on behalf of said trust and the absence of evidence allocating said payments between said trust and other services involved, these disbursements should be considered when the chancellor supervises the accounting between Jake and his successor trustee.

■■■ (c) The records kept by Pete fail to disclose any distribution of the net income to Sarah during Pete's lifetime, and plaintiffs contend Jake is personally liable for Sarah's share thereof, which they place at not less than $44,049.17. The net income from the trust estate was payable to the "Settlors"; that is, to "Pete Rosen and Sarah Rosen, husband and wife," "so long as both settlors shall live." Pete, as Sarah's husband, was head of the family. He, as plaintiffs state in their brief, acted as her agent in business and financial affairs. It is to be assumed that Pete paid the family living and other expenses. At Pete's death there was $24,507.86 in a joint bank account of Pete and Sarah, which Sarah received. There was testimony that Pete and Sarah placed all of their real estate in the big trust at the time of its execution. These settlors thereafter placed their interests in five additional pieces of real estate in the big trust, the last conveyance being in February, 1954. We find no fraud by Pete upon Sarah. She made no claim that there was any trust net income due her. She acquiesed in Pete's handling of the trust income, and she is bound by his acts, as are those claiming through her. As we view the record the evidence does not compel a finding that Sarah had a claim against the assets of the big trust or against Jake based upon Pete's handling of the big trust net income during Pete's lifetime. The chancellor's holding to that effect is sustained. Zahner v. Voelker, Mo.App., 11 S.W.2d 63 [3]; Harrellson v. Barks, Mo.App. 326 S.W.2d 351, 361.

(d) So far as material to issues discussed under this subdivision, the trust instrument provides (Second, (c)): "It shall rest in the absolute discretion of the Trustees to use either the principal or income of the Trust Estate, or proceeds of * * * condemnation proceedings, or any part thereof, for taxes, * * * improvements, repairs, rebuilding of real estate * * *, employment of agents or attorneys to take charge or care of real estate and/or other property, or otherwise for the benefit of the Trust Estate. The Trustees shall determine whether accretions to the Trust Estate shall be treated as principal or income. The Trustees may determine in their discretion whether receipts of money or other property shall be treated as principal or income and whether disbursements made by them for any purpose whatsoever shall be chargeable to principal or income. All decisions made by the said Trustees in *their* regard, in good faith, shall be final and conclusive upon all parties in interest."

Paragraph Second, (h) states "net income" "shall be the income left after deducting all charges, disbursements, and expenditures authorized hereunder or by law in connection with the administration of the Trust Estate, including a fee of 5% to the Trustees for services * * *, provided the Trustee shall have, in its discretion, charged these items to income instead of principal, as herein above set out."

■■■ We construe the trust provisions to authorize a commission upon the amount of

"yearly income" received and paid out by the trustee. In re Buder, 358 Mo. 796, 217 S.W.2d 563, 573 [11], citing authority. See Cornet v. Cornet, 269 Mo. 298, 190 S.W. 333, 342 [12, 13].

The trust sold its property at 8th and Main for $80,000, and at 41st and State Line for $10,000. Jake paid himself a trustee's commission of 1% on each sale. These properties were trust principal, as was the money received for them, including any gain. Jake in his reports treated them as trust principal. Proper and allowable real estate commissions were paid on each sale; and we conclude that this $900 for trustee's commissions was not "in good faith" payable. Mercantile-Commerce Bank & Trust Co. v. Morse, 356 Mo. 336, 201 S.W.2d 915, 922 [10]; In re McKinney's Estate, 351 Mo. 718, 173 S.W.2d 898 [7].

(e) On September 15, 1954, Jake issued a $4,559.22 check to himself for trustee's fees "till May 31, 1954." The chancellor held this was improperly charged against the net income due Sarah as the period covered was at a time when Sarah was entitled to only one-half of the net income. This item and others were held for adjustment upon Jake's accounting to the successor trustee. We approve.

(f) Jake's trustee's reports show depreciation deducted from income as follows: $14,123.57, report covering June 14 to December 31, 1954; $37,876.62 for the year 1955, and $39,137.56 for the year 1956. Ordinarily, and plaintiffs contend, depreciation should be borne by the remaindermen (Rossi v. Davis, 345 Mo. 362, 133 S.W.2d 363, 378 [14]), as should mortgage principal payments (Estey v. Commerce Trust Co., 333 Mo. 977, 64 S.W.2d 608, 616). Defendants say that said reports were intended to show depreciation deducted for income tax purposes, which is proper; and that Jake as executor of Pete's estate and surviving trustee was faced with complicated tax problems at Pete's death and soon thereafter with this litigation and did not attempt to make any distribution, which action was approved by the chancellor (Rossi v. Davis, supra, 133 S.W.2d 377 [12]). If depreciation be not deductible, said reports indicate there was net income for distribution by Jake to Sarah up to her death and to other beneficiaries thereafter. Plaintiffs adduced testimony that Pete's method of business was to make a small down payment for the equity in "run down" income producing property, and let the rent pay the taxes, mortgages, and upkeep. A reading of the trust provisions (Second, (c) and (h), quoted supra) vesting "absolute discretion" in the trustees "to use either the principal or income * * * for taxes, * * * improvements, repairs, rebuilding of real estate * * *, or otherwise for the benefit of the Trust Estate," and discretion to determine whether accretions to the trust estate or receipts of money or other property were to be treated as principal or income, leads to the conclusion, in the light of the settlors' handling of the trust assets (a significant factor) before the execution of the trust, that the settlors intended a reasonable reserve be maintained to meet depreciation and mortgage principal payments out of income and accretions for the preservation of the trust assets during the life of the trust. Such action accords with a realistic business policy, and is advantageous to life beneficiaries and remaindermen alike to prevent the deterioration of the trust assets (buildings used for business purposes, hotels, and apartment houses) and loss of assets to the trust through mortgage principal payments coming due. There was testimony that maintaining a reserve of $10,000 to $15,000 would be sufficient. The broad powers conferred upon the trustee and the record before us warrant the continuation of the settlors' method of preserving said assets, subject to supervision and adjustment by a court of equity. Raffety v. Parker, 8 Cir., 241 F.2d 594, 604 [3, 4]; Scott on Trusts, 2d Ed., §§ 188.2, 233.2, 233.3, n. 4, 239.4, nn. 5, 13; Restatement, Trusts, 2d, §§ 188, 239(h). The accounting between the trustee and his successor should give consideration to these matters.

(g) Plaintiffs contend the purchase and operation of the St. Regis Hotel as a going business was a breach of the trust because, among other grounds, the trust instrument does not authorize the conduct of a trade or business, the trustee dealt with his relatives, the purchase benefited the trustee and certain of his relatives, and created a conflict of interests between the trustee and the trust beneficiaries. Prior to reaching that issue, another of plaintiffs' contentions should receive comment.

■ Property in the big trust, referred to as the Main Street property, was taken in eminent domain proceedings. The top offer for the condemnor to Jake was $55,-000. Jake then contracted with Carl Hyken to give him ⅓ of all over $55,000 he could obtain for the property. Hyken sold the property of $80,000 in September, 1954, and accepted $8,000, a little less than the ⅓, for his services. The Rosen trust received, after the satisfaction of mortgages against the property and incidental expenses, $66,-888.40. Pete during his lifetime consulted Carl on real estate transactions and paid him commissions; and a plaintiffs' witness testified it was not uncommon to make contracts of this nature upon said ⅓ basis with real estate agents. We agree with the chancellor that the $8,000 payment was authorized.

The forced sale of the Main Street property occasioned, according to certified public accountant Joseph Bold, a capital gains tax of about $7,500, which could be postponed by reinvesting the proceeds in similar property within a certain time. Consideration was given to the purchase of the St. Regis Hotel, which rents apartments by the month or week and has twenty-seven hotel sleeping rooms. Without detailing the figures, Bold testified the Government would allow the following values for the St. Regis property: Land, $10,000; furniture, $150,-000, and building, $178,000; that he advised the trustee, Jake, such purchase would postpone payment of said $7,500.00 tax; that for income tax purposes depreciation would be allowed at the rate of 4% on the building and 20% on the furniture, and with a trustee's fee of 5% ($4,950.00 based on estimated $99,000 annual gross revenue), a saving of $8,751.56 would be effected on the big trust income passing to Sarah. On the advice of accountant Bold and attorney Charles Rubins, the big trust purchased the St. Regis Hotel October 23, 1954, for $338,-327.77, paying $65,000 cash. The purchase was subject to a first mortgage of $178,-270.48, a second for $13,039.53, and a third for $82,017.76. The trust is not liable on these mortgages. There was testimony that the market value of the St. Regis was $341,500. We understand the second mortgage, payable $500 monthly, was paid off in March, 1957.

The St. Regis was owned by a partnership. Jake's brother-in-law Phil Sweet was a member of the partnership and manager of the St. Regis, and Jake's mother-in-law was maker of the note secured by the third deed of trust. Sweet made a profit on the sale of $4,250.00 and Bold, also a partner, $1,000. The vendors paid Carl Hyken $2,-128.30 for selling the St. Regis. Jake pays Carl 5% of the St. Regis gross revenue as manager of the St. Regis. Two of defendants' expert witnesses testified this payment was not necessary. Jake draws an additional 5% of the gross for trustee fees. He knew little of the operation of the St. Regis, and it appears that others performed a number of his duties as trustee.

■ The continuance of a going business is always subject to the usual hazards of the trade; and this 10% take of the gross revenues for management and trustee's fees caused, we think, the operation of the St. Regis to be speculative and detrimental to the interests of the beneficiaries. See Vest v. Bialson, 365 Mo. 1103, 293 S.W.2d 369, 381 [18], 63 A.L.R.2d 504. A difference exists between income from rents, interest and dividends and income from the conduct of a business or trade. In the latter case, for instance, there is repeated use of the same money. See, among others, In re Lar-

rabee, 98 N.J.Eq. 655, 130 A. 195 [1, 2]; In re Sidenberg's Estate, 204 App.Div. 255, 197 N.Y.S. 767; Restatement, Trusts, 2d, § 242, c; Scott on Trusts, 2d Ed., § 242.1; Bogert, Trusts and Trustees, 2d Ed., § 578, nn. 57, 58. A separate bank account was maintained for the operation of the St. Regis Hotel. During 1956 Jake transferred $11,500 from the big trust account to the St. Regis Hotel account because the St. Regis Hotel had to have money to operate.

The trustee conducted the St. Regis Hotel as a going business. The chancellor approved this on the ground the broad provisions of paragraph "Second, (a)" of the trust instrument authorized the purchase and conduct of a hotel business, stating four former hotel properties were in the trust. Said paragraph "(a)" reads:

"(a) The Trustees are authorized and empowered to take charge, care, management and control, and to hold, maintain and operate the Trust Estate, and any and all property which may become a part thereof, according to their own judgment and discretion. As long as such property shall be in their possession, control or disposition, the Trustee shall have the full power and authority to invest and reinvest and to keep the Trust Estate invested; to convert and reconvert the same; to insure, improve, pledge, mortgage, exchange, sell or lease the Trust Estate or any part thereof for a period of ninety-nine (99) years or less, upon such terms and conditions, and when and as often as, in the judgment of the Trustee, it shall deem best; and to vary and change the investments thereof, whether original or subsequent. The said Trustee shall not be liable for any loss resulting from depreciation or shrinkage in the value of any security or property herein authorized to be held and retained as an investment of the Trust Estate."

"It is an elementary principle of law that a fiduciary may not risk trust property in trade or speculation, and this rule applies even where he simply continues the business or trade of the cestui que trust [a ward]." W. T. Sistrunk & Co. v. Navarra's Committee, 268 Ky. 753, 105 S.W.2d 1039, 1040 [2].

■ "In the absence of an express and sufficient authority therefor, the employment of trust property in trade or speculation, or in manufacturing, is a gross breach of trust on the part of the trustee, even though such investment is approved of by his own judgment, and is made with honest intent." 90 C.J.S. Trusts § 324, p. 516; Restatement, Trusts, 2d, § 227, f, § 230, m; Scott on Trusts, 2d Ed., § 227.6, § 230.4, stating it is the duty of a trustee to dispose of a testator's business and invest the proceeds in proper trust investments unless he is authorized to carry on the business by the terms of the will. An intent on the part of the settlor to continue his business "must be clearly proved." Bogert, Trusts and Trustees, 2d Ed., § 571, nn. 15, 16; § 577, n. 48. A stated reason is that "the trustee would have to be gifted with special business talents" not usually or reasonably expected of trustees in general. Id., § 678. See Eufaula Nat. Bank v. Manasses, 124 Ala. 379, 27 So. 258, 259; In re Wind's Estate, 1 Misc.2d 260, 145 N.Y.S. 2d 188 [2]; Clark v. Tennessee Chemical Co., 167 Ga. 248, 145 S.E. 73 [4].

■ The objects of trust investments are safety and income, safety being the primary and income the secondary consideration, that the trust assets pass without loss and with profit to the beneficiaries. Defendants say the dominant purpose of this trust was to take over the real estate acquired through Pete's efforts and to keep the same or a similar body of real estate for a period of 20 years after the death of the surviving settlor. Pete ceased to conduct a trade or business about 1942, and thereafter devoted his time to acquiring income producing real estate by small down payments and letting the rents pay the taxes, mortgages, and upkeep. He trained Jake and Carl in this business. "The Trustees are in duty bound to administer the trust so far as possible in the same manner as the

testator would have done had he been living." Bakewell v. Mercantile Trust Co., Mo., 319 S.W.2d 600 [3], 605.

Each of the four hotel properties in the trust was rented to a tenant who, not the trustee, operated the hotel.

We do not have a trustee continuing the business of the settlor; but a trustee, without the consent of all the beneficiaries or the approval of a court having jurisdiction, investing trust funds in and engaging in a different trade or business from that in which the settlor had engaged.

■■■■■ The trust instrument does not in express terms authorize the operation of a going trade or business with trust assets. Notwithstanding it speaks of the trustees' operating the trust estate according to their own judgment and discretion, a reading of the whole of paragraph "(a)," including the authority to "vary and change the investments thereof, whether original or subsequent" reveals that said paragraph refers to investments, and the investments referred to are securities and property, the latter referring to real estate yielding an income in the form of rent. These may depreciate or shrink in value for reasons not chargeable against any action on the part of the trustee. There is no showing that Pete, as trustee, employed the trust assets in operating a going business or trade. Defendants' construction of the trust instrument as authorizing a trustee's fee of 5% on the amount of "yearly income" (gross rentals) is not in harmony with a 5% fee on money which, in effect, is repeatedly used in the conduct of a going business or trade. A reasonable construction of paragraph "(a)," in the light of the circumstances surrounding the settlors and other provisions of the trust instrument, results in the conclusion that the operation of the St. Regis Hotel as a going business was not authorized by the settlors. Garesche v. Levering Inv. Co., 146 Mo. 436, 445(I), 48 S.W. 653, 655(1), 46 L.R.A. 232, is in harmony with the above result.

(h) Exhibits filed here show the big trust gross income and trustee's fees paid Jake, respectively, as follows: June 14 to December 31, 1954: $21,266.69 and $7,160.-22 (which, we understand, included $4,559.-22 for the period Pete was administering the trust assets); 1955: $60,918.56 and $8,-951.38; 1956: $49,666.04 and $7,513.85.

■■■■ We conclude the best interests of the trust estate require the removal of Jacob Rosen as trustee for the breaches of the trust hereinbefore mentioned. The chancellor removed him on the ground that, considering all the circumstances involved, his actions tended to engender suspicion and hostility on the part of plaintiffs and resulted in a bitter schism within the family. We are of the view that the chancellor's holding is supported by the evidence, but it is unnecessary to burden this opinion with a narration of the facts involved.

■■■■ (i) The chancellor, although removing Jake as trustee, considered Jake was not guilty of fraud, dishonesty, bad faith, or willful violations of his duties, and found the issue of Jake's forfeiture of all compensation under Count III against plaintiffs. We approve, considering the court did not abuse its discretion in so ruling. Restatement, Trusts, 2d, § 243, states: "If the trustee commits a breach of trust, the court may in its discretion deny him all compensation or allow him a reduced compensation or allow him full compensation." See Scott on Trusts, 2d Ed., § 243; Bogert, Trusts and Trustees, 2d Ed., § 979; 90 C. J.S. Trusts § 407, p. 756; 54 Am.Jur. 424, § 539; Annotation, 110 A.L.R. 566, 577 (citing Garesche v. Levering Inv. Co., 146 Mo. 436, 48 S.W. 653, 658, 46 L.R.A. 232, and Cornet v. Cornet, 269 Mo. 298, 190 S.W. 333, 343 [13]); Vest v. Bialson, supra, 293 S.W.2d 369, 383 [25]. However, any compensation allowed Jake should be conditioned upon all losses his administration occasioned the trust estate being made good. See Garesche and Cornet, supra.

With the exception of such matters as may arise in the accounting between the re-

moved and successor trustees, the findings and holdings of the chancellor on matters involved in Count III not herein specifically disapproved are affirmed.

IV. The chancellor allowed, payable out of the big trust estate, $20,000 each to Walter A. Raymond and Arthur J. Kase, defendants' attorneys, "for services in the defense of the Rosen trust herein." No point is presented covering the allowance to Daniel S. Millman and Terence M. O'Brien, plaintiffs' attorneys, "of $7,500.00 jointly" for services under Count III, resulting, among other things, in Jacob Rosen's removal as trustee. The main controversy is whether said allowance to defendants' attorneys is inadequate or excessive.

 Plaintiffs first say defendants' attorneys are not entitled to compensation out of the trust assets because Jake breached the trust, stressing Lipic v. Wheeler, 362 Mo. 499, 242 S.W.2d 43, 50[12], which cites, without developing, the texts and annotation mentioned in the third paragraph above. The settlors authorized the trustee to employ attorneys "for the benefit of the trust estate." Paragraph "Second, (c)" supra III, (d). Defendants' attorneys are entitled to compensation out of the trust assets for their successful defense of the trust. Murphey v. Dalton, Mo., 314 S.W.2d 726, 730[3-5], 67 A.L.R.2d 1278; City of St. Louis v. McAllister, 302 Mo. 152, 257 S.W. 425, 426[1]. The criterion for an allowance of attorney fees out of a trust estate is the reasonableness of such compensation, whether one or more attorneys necessarily participate. See 54 Am.Jur. 415, § 523; 90 C.J.S. Trusts § 284, p. 399; Annotation, 66 A.L.R.2d 1172.

There was testimony that 200 hours were devoted to the actual trial of the case. Mr. Raymond estimated that ⅓ of his working time between February 15, 1955, and September 11, 1958, the date of the hearing on the allowances, was devoted to the case. There was testimony to support a finding that Mr. Kase devoted 1,100 to 1,150 hours to the case. Mr. Millman and Mr. O'Brien

estimated they had devoted a total of 3,200 hours to the case, and allocated 800 hours of this to the removal of the trustee. We conclude defendants' attorneys devoted approximately the same time to the case, perhaps 300 or more hours less, that plaintiffs' attorneys did, although defendants' proof was not as satisfactory as it might have been. All the attorneys involved, the principals and their expert witnesses, stand high in their profession.

Defendants say, had the counts of plaintiffs' fourteen count petition not directly attacking the big trust been omitted, that almost all of the same evidence and the main litigated issues would have been for consideration under plaintiffs' claim of conspiracy, fraud, duress, and lack of mental capacity on the part of Sarah, and also on the removal of Jake as trustee, particularly on the hostility issue.

Mr. Raymond considered $30,000 to $35,000 a reasonable fee for his services. He was employed by Mr. Kase. He estimated that 1% of his time was devoted to the individual defendants and 99% in defense of the big trust. He had received $14,000 from the big trust and $3,500 which he considered adequate, from the individual defendants. He furnished each of his expert witnesses with a statement (exhibit 606) of his services to the big trust, which conformed to defendants' position, stated above, on this issue. Mr. William S. Hogsett and Mr. Paul Barnett each considered a $30,000 fee to Mr. Raymond reasonable. Each based his opinion on Mr. Raymond's exhibit 606. Mr. Kase considered his services were reasonably worth $35,000. He had received $10,000 from the big trust and $2,500 from the individual defendants and would bill them for $1,500 additional. He too furnished a statement (exhibit 607) similar to Mr. Raymond's to his expert witnesses. Mr. Reed O. Gentry placed a reasonable fee to Mr. Kase at between $34,000 and $35,000, and Mr. Paul Sprinkle put it at $50,000. Each based his opinion on Mr. Kase's exhibit 607. Mr. Sprinkle thought the case involved a trust estate of approximately

$1,000,000 in which all the defendants were beneficiaries of the trust. For factors taken into consideration see Scheufler v. Continental Life Ins. Co., 350 Mo. 886, 169 S.W. 2d 359, 363, 364.

We have hereinbefore stated the purposes of Counts I, III, VII, and VIII. We briefly state the purpose of some of the other counts. Mr. Raymond considered Count XIII, charging Mary and Ben Bodney with the conversion of $3,000 allegedly taken from the dead body of Pete Rosen, not involved, but Mr. Kase differed. Mr. Kase considered the following counts not involved: Count XII, an action to declare Jake held the proceeds ($2,001.26) of a policy on Sarah's life as trustee for her estate instead of individually; and Count XIV, an action to recover the proportionate share of the federal estate and Missouri inheritance taxes on Sarah's estate from each defendant. Count XIV was not ready for and was not tried. Count XI was an action by Morris Rosen to be declared the owner of a ½ interest in certain real estate standing in the name of the Rosen trust. Count IV was to set aside six deeds from Pete and Sarah to Jake and Betty and three deeds to Sue and Carl. Count V was to set aside three deeds from Pete and Sarah to Jake and Betty, five deeds to Sue and Carl, and one deed to Jake and Betty and Sue and Carl. Count VI was to recover from Sue and Carl the value of two parcels of land similarly conveyed to them but subsequently disposed of. The value of the property involved in Counts IV, V, and VI was alleged to exceed $297,000. Count IX was for partition of the various lands if the court set aside the big trust and the deeds under the prior counts. The individual defendants reaped the benefit of the rulings in their favor under Counts IV, V, VI, and IX and other counts and should stand a reasonable charge for the services of their attorneys. Plaintiffs, not defendants, prevailed on the issue of the removal of Jake as trustee under Count III. Jake's administration of the $24,383.81 in the little trust following Sarah's death (Count VII) had no effect on

the validity of the big trust. We do not agree with Mr. Raymond's allocation of 1⅞% of his services to the interests of the individual defendants. His $3,500 charge against them refutes his position as does Mr. Kase's charge of $4,000. The services of the attorneys in preparing for and in the trial of some of the counts in plaintiffs' petition overlapped, but not to the extent claimed by defendants.

We conclude the allowances chargeable against the big trust for the services of Mr. Raymond and Mr. Kase, perhaps somewhat liberal, should be and are approved.

The judgments on Count I and the allowance of attorney fees are affirmed. The judgments on Counts III, VII, and VIII are reversed and said counts remanded for further proceedings in conformity herewith.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion of BOHLING, C., is adopted as the opinion of the court.

All concur.

On Motion for Clarification and Modification of the Opinion

PER CURIAM.

Plaintiffs filed no motion for rehearing but have filed a motion "for clarification and modification of the opinion." They say that the St. Regis purchase was unauthorized, and the trustee should be surcharged with the purchase price of the St. Regis investment because it was the purchase of a going business. This may be the situation in certain circumstances, but the issue of the purchase of the St. Regis property and the issue of its operation stand on different footings under the provisions of the "big trust." Giving consideration to the settlors' method of doing business, the

 

big trust provisions vesting broad powers in and exonerating the trustees from liability for any loss resulting from depreciation or shrinkage in the value of any property authorized to be held and retained as an investment of the trust estate, the facts of record and the findings and conclusions of the trial chancellor, we have held and reaffirm that the purchase of the St. Regis Hotel as a parcel of real estate was proper. Plaintiffs' said motion is overruled.